IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SUMMIT ELECTRIC SUPPLY CO., INC.,

       Plaintiff,

vs.                                                    Civil No. 07-0431 MCA/DJS

INTERNATIONAL BUSINESS MACHINES CORP.,

       Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on Summit Electric's First Motion to Compel **[Doc. No. 39]**, filed on June 20, 2008, and fully briefed on August 26, 2008.  Summit Electric (Summit) served its first set of interrogatories and first request for production of documents on IBM, and, in its response, IBM asserted various objections, including relevancy and the attorney-client privilege and/or work product.  Summit moves the Court to compel IBM to fully respond to its request for production.  Having reviewed the motion, the memoranda in support and in opposition, and the relevant law, and being otherwise fully informed, the Court finds that the motion is well taken and will be granted in part.

## I.  Discussion

The Court views discovery requests with the liberality contemplated by the federal rules. Discovery is designed to ""[m]ake trial less a game of blind man's buff and more a fair contest with basic issues and facts disclosed to the fullest possible extent."  *United States v. Proctor and Gamble Co.*, 356 U.S. 677, 682, 78 S.Ct. 983, 986-87 (1958).  Federal courts construe discovery rules liberally to insure a litigant's right to discovery is broad and flexible.  *Goldman v. Checker*

*Taxi Co.*, 325 F.2d 853, 855 (7th Cir. 1963).  Under Rule 26, "parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense."  FED.R.CIV.P 26(B)(1).

The test of relevancy is significantly broader at the discovery stage, therefore, discovery is permitted as to matters which "[are] or may become relevant," *Payer, Hewitt & Co. v. Bellanca Corp.*, 26 F.R.D. 219, 221  (D.Del.1960), or "might conceivably have a bearing" on the subject matter of the action, *Triangle Mfg. Co. v. Paramount Bag Mfg. Co.*, 35 F.R.D. 540, 542 (E.D.N.Y.1964); *see also E.I. duPont de Nemours & Co. v. Deering Milliken Research Corp.*, 72 F.R.D. 440, 443 (D.Del.1976)( "Unless it is palpable that the evidence sought [to be made subject to discovery] can have no possible bearing upon the issues, the spirit of the new [federal] rules calls for every relevant fact . . . to be brought out for the inspection not only of the opposing party but for the benefit of the court . . . .")(citing *Hercules Powder Co. v. Rohm & Haas Co.*, 3 F.R.D. 302, 304 (D.Del.1943)).

### A.  Objections Based on Attorney-Client and/or Work Product

The attorney-client privilege "protects confidential communications by a client to an attorney made in order to obtain legal assistance from the attorney in his or her capacity as a legal advisor." *United States v. Phelan*, 3 Fed.Appx 716, 718 (10th Cir. 2001).  The privilege is narrowly construed. *Fisher v. United States*, 425 U.S. 391, 403 (1976).  A party claiming the attorney-client privilege must prove its applicability. *Foster v. Hill* (In re Foster), 188 F.3d 1259, 1264 (10th Cir. 1999).  In diversity cases, state law supplies the rules concerning attorney-client

privilege.  *See Frontier Refining, Inc. v. Gorman-Rupp Co., Inc.*, 136 F.3d 695, 699 (10th Cir. 1998).[1]

"Under New Mexico law, the attorney-client privilege applies to 'confidential communications made for the purpose of facilitating the rendition of professional legal services to the client.'"  *Anaya v. CBS Broadcasting, Inc.*, – F.R.D. – , 2007 WL 5232016, at *4 (D.N.M. (July 6, 2007)(quoting *Bd. of Comm'rs of Doña County v. Las Cruces Sun News*, 2003-NMCA-102, ¶25, 134 N.M. 283, 76 P.3d 36, 44).  The privilege protects communications with in-house counsel as well as outside attorneys. *Upjohn Co. v. United States*, 449 U.S. 383, 390, 101 S.Ct. 677, 683, 66 L.Ed.2d 584 (1981).  However, "[c]hanneling work through a lawyer rather than having non-legal personnel perform it does not provide a basis for claiming attorney-client privilege."  *Anaya*, 2007 WL 5232016, at *5.

On the other hand, the attorney work-product doctrine "shelters the mental processes of the attorney, providing a privileged area with which he can analyze and prepare his client's case." *In re Qwest Communications Int'l Inc.*, 450 F.3d 1179, 1186 (10th Cir. 2006)(quoting *United States v. Nobles*, 422 U.S. 225, 238 (1975)).  "Work product can be opinion work product, which some courts have held to be absolutely privileged, or non-opinion work product, i.e., fact work product, which may discoverable under appropriate circumstances."  *Id.*  The protection applies to "attorneys' or legal representatives' mental impressions, conclusions, opinions, or legal theories authored in anticipation of litigation."  *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 668 (10th Cir. 2006).  "The party asserting a work product privilege as a bar to

---

[1] Although IBM cites to New Mexico law regarding application of the attorney-client privilege, IBM contends New York law governs in this case based on the choice of law provision in the IBM Customer Agreement.  Nonetheless, IBM asserts that under New York law, the attorney-client privilege would also protect the documents addressed in Summit's motion to compel.

discovery must prove the doctrine is applicable." *Resolution Trust Corp. v. Dabney*, 73 F.3d 262, 266 (10th Cir. 1995).  "The proponent of the privilege must make a competent evidentiary showing to support the claim; conclusory assertions of privilege will not suffice." *Martin v. Valley Nat'l Bank of Arizona*, 140 F.R.D. 291, 302 (S.D.N.Y. 1991).[2]

The Court will analyze each disputed document in light of these standards.

**1.  Document Nos. 1, 2, 14, 15, 19, and 49**

As a preliminary matter, IBM contends that Document Nos. 2 and 49 are the same document.  Moreover, Summit has withdrawn its motion to compel as to Document Nos. 1, 2 and 49.  Additionally, IBM has agreed to produce Document Nos. 14 and 15 without the handwritten notes of Eric R. Bradley, IBM's in-house lawyer.  Accordingly, Document Nos. 14 and 15 are no longer in dispute.  However, in its reply, Summit complains IBM has not produced Document Nos. 14 and 15.  If IBM has not yet produced these documents, it shall do so no later than 5 days from the filing of this Memorandum Opinion and Order.  Finally, the parties assert there is no longer a dispute regarding Document No. 19.

**2.  Document Nos. 4, 5, 17, 21, 24, 30, 32, 35, 38, 43, 44, 46 and 47**

IBM objected to Documents Nos. 4, 5, 17, 21, 24, 30, 32, 35, 38, 43, 44, and 47 on the basis of attorney-client privilege.  According to Plaintiff these documents are e-mail strings– that is, documents containing multiple e-mails.  Plaintiff argues a substantial number of these e-mail strings are discoverable as they are either authored or received by individuals who are not attorneys, and the attorney is "merely 'copied' with the communication."  Pl.'s Mem. in Supp. of Mot. to Compel at 5.

---

[2] IBM withdrew several work product objections.  Thus, IBM contends there are no longer any documents it withheld solely on the basis of work product at issue.  Def.'s Resp. at 5.

However, as IBM points out, "the essential elements of the [attorney-client] privilege . . . do not require an attorney to have either authored or received the document at issue in order to maintain the privilege." *Williams v. Sprint/United Management Co.*, No. 03-2200-JWL-DJW, 2006 WL 266599, at *2 (D.Kan. Feb. 1, 2006).   Rather, "what is vital to the privilege is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer." *Id.*  By the same token, "not all communications to or from counsel are privileged; rather they must relate to legal advice." *Burton v. RJ. Reynolds Tobacco Co.,* 177 F.R.D. 491, 496 (D.Kan. 1997).

### a.  Document Nos.  4 and 5

IBM contends Document Nos. 4 and 5 comprise an e-mail string among members of IBM's Summit Electric project team and an in-house attorney employed by IBM.  Michael Osterman, Associate Partner responsible for IBM's contract with Summit, submitted his declaration, declaring Document Nos. 4 and 5 contain a series of six e-mails that are either to or from IBM attorney, Ellen McDonald.  Def.'s Resp., Ex. C, Osterman Decl. ¶3.  Only one e-mail in this group is from Mr. Osterman to IBM employees providing them with Ms. McDonald's legal advice.  *Id.*  The remainder of the e-mails either contain Ms. McDonald's legal advice or were sent to her to facilitate her rendering of legal advice.  *Id.*

### b.  Document No. 17

IBM contends Document No. 17 is an e-mail communication from Michael Osterman to Jesus Mantas, Paul King and attorney Eric Bradley, in-house counsel for IBM, in which Mr. Osterman offers comments that supplement Mr. Mantas's request for legal advice from Mr. Bradley.  *Id.* ¶4.  Mr. Mantas is a partner and Vice-President of IBM.

**c.  Document No. 21**

Document No. 21 is an e-mail string consisting of a series of six-mails.  This e-mail string contains legal advice given to IBM employees by IBM in-house counsel.  All but two of the e-mails have been produced in discovery.  The second and sixth e-mails in this e-mail string have not been produced.  The second e-mail contains instructions to IBM employees from the IBM legal department.  The sixth e-mail is an e-mail addressed to Ellen McDonald "for the purpose of facilitating the rendition of Ms. McDonald's legal advice."  Def.'s Resp., Ex. C, Osterman Decl. ¶5.

**d.  Document Nos. 24 and 30**

Document No. 24 is an e-mail string between Jesus Mantas, Joseph DeBella, Michael Osterman and Ellen McDonald.  Mr. Mantas authored the e-mail and sent it to Ms. McDonald and other IBM employees involved in the Summit project "for the purpose of obtaining Ms. McDonald's legal advice regarding IBM's rights and obligations under its contract with Summit." *Id.*, Ex. B, Mantas Decl. ¶4.

Document No. 30 is an e-mail string consisting of four e-mails.  Mr. Mantas sent the first and fourth of the e-mails to IBM employees Paul King and Mike Osterman "for the purpose of facilitating Ms. McDonald's rendition of legal advice regarding IBM's obligations under its Statement of Work with Summit." *Id.* ¶5.  Mr. Osterman and Mr. King included Ms. McDonald on the third and fourth e-mails "for the purpose of facilitating Ms. McDonald's rendition of legal advice on the same subject." *Id.*

**e.  Document No. 32 and 46**

Document No. 32 is an e-mail string consisting of four e-mails.  Mr. Osterman sent the first e-mail to IBM's attorney, Eric Bradley, "for the purpose of requesting and facilitating Mr.

Bradley's  rendition of legal advice regarding IBM's Statement of Work with Summit."  Def.'s

Resp., Ex. B, Mantas Decl. ¶6.  Mr. Bradley sent the second and fourth e-mails "for the purpose

of providing his legal advice.  *Id.*  Mr. Bradley copied this e-mail to Carl Hahn, another IBM

attorney. *Id.*  Mr. Mantas sent the third e-mail requesting legal advice from Mr. Bradley.  *Id.*

### f.  Document Nos. 35, 38, 43, and 44

Document No. 35 is an e-mail addressed to Eric Bradley and other IBM employees

involved in the Summit project.  *Id.*, Ex. A, Bradley Decl. ¶6.  Mr.Bradley asserts the e-mail was

to facilitate his "rendition of legal advice."  *Id.*  Document No. 38 is an e-mail addressed to Eric

Bradley, requesting legal advice.  *Id.* ¶7.  Documents Nos. 43 and 44 are e-mails addressed to Mr.

Bradley and other IBM employees involved in the Summit project, requesting legal advice.  *Id.*

¶8.

### g.  Document Nos. 46 and 47

Document No. 46 is an e-mail authored by Mr. Osterman and sent to Mr. Bradley, Mr.

Mantas, and Paul King.  Mr. Osterman sent the e-mail to Mr. Bradley "for the purpose of

facilitating his rendition of legal advice."  *Id.*, Ex. C, Osterman Decl. ¶6.  Document No. 47 is an

e-mail Mr. Osterman sent to Mr. Mantas, Paul King, and other IBM employees.  *Id.* ¶7.  Mr.

Osterman copied this e-mail to Mr. Bradley "for the purpose of facilitating his rendition of legal

advice."  *Id.*

Plaintiff argues that IBM failed to provide sufficient detail to determine whether the

privilege applies to these documents.  Additionally, Plaintiff asserts that the language, "for the

purpose of facilitating his rendition of legal advice," found throughout Exhibits A-C is conclusory

and insufficient.

IBM has tendered the documents at issue for *in camera* review.  Therefore, the Court will review the contents of these e-mail exchanges (Document Nos. 4, 5, 17, 21, 24, 30, 32, 35, 38, 43, 44, 46 and 47) *in camera* and determine whether the attorney-client privilege applies to these documents.

### B.  Objection Based on Relevance

In Interrogatory No. 3, Summit asked IBM to identify "other customers" who have implemented Wholesale Express, as well as primary contacts for those customers and the start and end dates of the implementation.

IBM objected to Interrogatory No. 3 "because it seeks discovery of information that is not relevant to any of Summit's claims, nor is it reasonably calculated to lead to the discovery of admissible evidence."  Pl.'s Mot. to Compel, Ex. 2.  IBM also objected on the grounds that the interrogatory was "overly broad and not restricted to any time period."  *Id.*

Summit contends "the experiences of other IBM customers with the same product, both before and after the Summit project, are clearly relevant to determining whether the product was 'ready to run and ready to use' for Summit."  *Id.* at 6.  An important issue in this case is whether Wholesale Express was "ready to run and ready to use" when Summit purchased it, as IBM represented in the contract with Summit.  Summit argues a negative experience by another IBM customer prior to the Summit project would tend to prove that Wholesale Express was not yet "ready to run and ready to use" and would show IBM's knowledge of problems at the time IBM made contrary representations to Summit.  Summit also argues that prior knowledge of problems with Wholesale Express is relevant to Summit's Unfair Practices Act claim that IBM's conduct was willful and subject to treble damages.

Summit also want discovery of those customers purchasing Wholesale Express <u>after</u> Summit and having encountered the same problems with the product.  Summit contends that if these customers encountered the same problems as Summit that would tend to show that such problems in fact existed and, if the product was not "ready to run and ready to use" for these customers, then it also was not ready for Summit.

IBM counters that seeking the identity of "each and every customer that has ever contracted with IBM to implement Wholesale Express" is not relevant to what may have occurred between it and Summit.  IBM contends it can provide the information directly to Summit regarding other Wholesale Express implementations and whether there were fundamental problems with its product.  Additionally, IBM contends Summit has not yet deposed Joseph DeBella, the individual responsible for IBM's SAP implementations in the United States.  Mr. DeBella retired in June 2008.  IBM argues Summit can get the information it seeks from Mr. DeBella as it seeks from IBM customers.

IBM also alleges Summit "hopes to harass IBM's customers and needlessly embroil them in discovery related to this cause– all to IBM's detriment."  Def.'s Resp. at 13.  To support this allegation, IBM submitted a May 27, 2008 letter in which its counsel addressed this issue with Summit's counsel.  *Id.*, Ex. D.  In that letter, IBM's counsel wrote:

> IBM values its customer relationships, and is aware that Summit previously insinuated that it would, and attempt to, disparage IBM in the eyes of customers and potential customers.  For example, Vic Jury wrote Michael Osterman on September 6, 2005, and said he would "be hard pressed to hold [his] thoughts about IBM and Wholesale Express" at the National Association of Wholesalers Large Company CEO/COO Conference.  At the SAP Sapphire convention two years ago, Mr. Jury and Christina Austin apparently sought out Joe DeBella, and Ms. Austin used the crowded event as an opportunity to attempt to discredit IBM in front of its customers.

*Id.*  In the same letter, IBM suggested Summit propound discovery to IBM on the topics it needed.  If, after reasonable efforts to obtain the information sought from IBM, Summit still

believed it could only obtain appropriate discovery from customers, then IBM would reconsider its position.

Because Summit may be able to obtain the desired information from Mr. DeBella and because IBM represented it would reconsider its position regarding allowing Summit to obtain the discovery sought from IBM customers, the Court will sustain IBM's objection.  However, the Court will reconsider this matter if Summit and IBM cannot resolve this issue.

**NOW, THEREFORE,**

**IT IS HEREBY ORDERED** that Summit Electric's First Motion to Compel **[Doc. No. 39]** is granted in part.  IBM will submit Document Nos. 4, 5, 17, 21, 24, 30, 32, 35, 38, 43, 44, 46 and 47 to the Court on or before October 20, 2008, for *in camera* review.


_____

**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**