# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**SUMMIT ELECTRIC SUPPLY
COMPANY, INC.**

Plaintiff,

vs.                                        No. 1:07-cv-0431 MCA/DJS

**INTERNATIONAL BUSINESS
MACHINES CORPORATION,**

Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the following motions:  (1) Plaintiff

*Summit's Motion for Partial Summary Judgment* [Doc. 94] filed on February 18, 2009; (2)

*Defendant International Business Machines Corporation's Motion for Summary Judgment*

[Doc. 101] filed on February 23, 2009; and (3) *Defendant International Business Machines*

*Corporation's Objections to Summary Judgment Evidence and Motion to Strike* [Doc. 107]

filed on March 10, 2009.  Having considered the parties' submissions, the relevant law, and

otherwise being fully advised in the premises, the Court grants in part and denies in part

IBM's motion for summary judgment, denies Summit's motion for summary judgment, and

grants IBM's motion to strike for the reasons set forth below.  The result of these rulings is

that Summit's claim for breach of contract is subject to the "limitation of liability" clause in

its agreement with IBM, and Summit's negligent misrepresentation claim is barred by the

merger clause in that agreement.

## I.     BACKGROUND

Based on diversity of citizenship under 28 U.S.C. § 1332, Plaintiff Summit Electrical Supply Company, Inc. ("Summit") filed this civil action against Defendant International Business Machines Corporation ("IBM") on May 3, 2007.  In its original *Complaint* [Doc. 1], Summit asserted that IBM is liable for damages due to breach of contract, misrepresentation, and the violation of New Mexico's Unfair Practices Act (UPA). On a motion filed by IBM on June 28, 2007, the Court dismissed Summit's misrepresentation claim and granted leave to file an amended complaint.  [Doc. 6, 26.]  Summit filed its *Amended Complaint* [Doc. 29] on April 14, 2008, adding claims of fraud and negligent misrepresentation in place of the dismissed count.   IBM then filed an *Answer* and *Counterclaim* [Doc. 34] for breach of contract on May 9, 2008.

Following an extension of time for completing discovery and dispositive motions [Doc. 64, 71], the parties filed cross-motions for partial summary judgment on the third affirmative defense asserted in IBM's *Answer*, *i.e.*, that Summit's damages are barred, in whole or in part, by the "limitation of liability" provision in a customer agreement between the two parties.  [Doc. 94, 101.]  IBM also moved for partial summary judgment on Summit's tort claims on the grounds that they are barred by a contractual merger clause and/or the "economic loss rule."  [Doc. 101.]  In addition, IBM filed a motion to strike portions of the evidence submitted with Summit's cross-motion on the grounds that these items violate the "parol evidence rule" and are otherwise inadmissible.[1]  [Doc. 107.]

---

[1]Other pending motions [Doc. 96, 98, 99] which touch on Summit's damage calculation model and the admissibility of witness testimony concerning that model are addressed in a

The undisputed facts and evidence of record regarding the parties' cross-motions for summary judgment on the contractual limitation of liability, merger clause, and economic-loss rule can be summarized as follows.  Summit is a wholesale distributor of electrical products.  In 2003, Summit began searching for an integrated financial and distribution system computer software for the purpose of implementing a "total enterprise solution."  Implementing a total enterprise solution required the assistance of a third party, and after a series of discussions, Summit settled on IBM to perform the work.  They agreed that IBM would implement a business software package called "Wholesale Express" which is manufactured by a company called SAP.  Summit believed, allegedly based on representations by IBM, that Wholesale Express was a superior product and would be easier and less time-consuming to implement, and that IBM, who has a close relationship with SAP, was qualified to implement this software package.

In March 2005, Summit and IBM signed a contract document, which they refer to as the "Statement of Work" or "SOW."  Several months of negotiations and proposals preceded execution of the SOW.  The SOW is purported to be a 141-page document that describes how the SAP software would be implemented and how it would function.  Neither party disputes that the document referenced as the SOW is a binding contract.  Section 4.0 of this document describes implementation in five stages:   (1) Project Preparation phase; (2) Business Blueprint phase; (3) Realization phase; (4) Final Preparation phase; and (5) Going

_____

separate order.

Live.  [Doc. 101-4 at 3.]

IBM commenced work in April 2005, but never completed the work.  The project broke down at the Business Blueprint stage.  Summit contends that IBM quit in November 2005, and that Summit had to spend substantial resources to complete the project that IBM abandoned.  According to Summit, IBM also failed to adequately staff the project with the personnel necessary to complete the work properly and on time, and the Wholesale Express software package was not sufficiently developed or "ready to run" as IBM represented.

IBM, on the other hand, contends that it attempted to perform its obligations and to deliver the software and services Summit had contracted for, but was continually met with demands for features over and above the agreed scope of work.  IBM alleges that Summit refused to pay for the additional features it demanded, and that it also failed to timely perform its responsibilities such as to make certain technical and business decisions, perform testing, implement employee incentive programs, and pay outstanding invoices.  IBM claims that Summit's refusal to abide by the contract prevented IBM from performing its work, and that it therefore gave notice and terminated the contract.

When the parties' contract dispute gave rise to litigation, IBM asserted that "Summit's alleged damages are barred, in whole or in part, by the limitation of remedies contained in Summit's IBM Customer Agreement."  [Doc. 34 at 7.]  IBM further asserted that the same agreement contained a "merger clause" that precludes Summit from bringing any tort claims based on the parties' negotiations that preceded the formation of the contract.  The "IBM

4

Customer Agreement" or "ICA" containing these two clauses is separate from the "Statement of Work" or "SOW" mentioned above.

IBM contends that the use of two separate documents to define its contractual relationships with its customers is a standard practice and that its contracts typically consist of two parts: (1) a "relationship agreement" that contains basic standard terms and conditions; and (2) a transaction-specific agreement that defines the scope of work to be performed for a particular project. [Doc. 101-2 at 1.] IBM has several types of "relationship agreements" (also called "base contracts"); the type of relationship agreement at issue here is called the "IBM Customer Agreement" or "ICA." [Doc. 101-2 at 2.] Another example is the "Master Services Agreement." [Doc. 101-2 at 3.] The ICA is the most comprehensive of IBM's relationship agreements, as well as the most commonly used, and would apply when a customer acquires products, hardware, and services. [Doc. 101-2 at 3.] The Master Services Agreement, by comparison, would be used when a customer is acquiring only services. [Doc. 101-2 at 3.]

It is undisputed that IBM has a policy whereby it will not conduct business with a customer, or engage in any transaction-specific document, unless some version of a relationship agreement with that customer is in place. [Doc. 101-2 at 1–2.] Once a customer signs a relationship agreement, IBM considers it to govern the business relationship and all subsequent transactions with that customer year after year. The customer typically is not asked to execute a new relationship agreement for each new transaction. [Doc. 101-2 at 4.]

In this case, IBM alleges that Summit executed a relationship document, and specifically, the IBM Customer Agreement, in 1992.  [Doc. 101-5.]  According to IBM, the version of the ICA that Summit signed was Version 00, a version that IBM began using in 1991, and was IBM Form Z125-4575-00.[2]  [Doc. 101-5.]  IBM alleges that the ICA Summit signed was assigned an identifying number—#91V137.  [Doc. 101-5.]  IBM further alleges that Summit has, throughout the years and apparently without incident until now, agreed to numerous smaller projects with IBM, all subject to the ICA Summit signed in 1992.  [Doc. 101 at 9.]  IBM claims that the ICA continues to apply to the contract that is the subject of this lawsuit.  Summit contends that the ICA does not apply here and disputes that it ever signed the ICA.

The undisputed facts and evidence of record concerning the formation of the transaction-specific agreement that gave rise to this litigation can be summarized as follows. When Summit began a search for a comprehensive computer software system in 2003 and eventually settled on the Wholesale Express package by SAP, IBM purportedly represented itself as an SAP "partner" that was qualified to implement the package.  [Doc. 94 at 2.]  On June 18, 2004, Mike Osterman, an IBM representative, provided a proposed statement of work to Summit for implementation of the SAP software.  [Doc. 94-3.]  Mr. Osterman's cover letter stated, in part, that IBM's services would be performed as described in the

---

[2]ICA Version 00 was the first version of the ICA and was in use until March 1993 when it was replaced by ICA Version 01.  [Doc. 101-5 at 2.]  There have been nine versions of the ICA since Version 00, with the most recent version being Version 09, which went into effect in January 2009.  [Id.]

enclosed statement of work and "in accordance with the terms of the IBM Customer Agreement." [Doc. 94-3.] The proposed statement of work attached to Mr. Osterman's June 18, 2004, letter included the following statement: "This section defines the scope of work to be accomplished by IBM under the terms and conditions of the IBM Customer Agreement (HQ 12291)." [Doc. 94-3 at 2; Doc. 94-5 at 2.] The IBM Customer Agreement itself was not attached. [Doc. 94-4 at 3.] According to Mr. Osterman, he normally does not attach Customer Agreements to his proposals; rather, he simply refers to the agreement that is on file for that customer. [Doc. 94-4 at 3.]

The parties continued to negotiate, and in the months following June 2004 they engaged in further discussions, site visits, demonstrations, and revisions to the statement of work. [Doc. 94-4 at 4.] As negotiations were coming to a close, in or around February 2005, Summit's Vice President and Chief Financial Officer, Brad Seward, asked Mr. Osterman to provide "everything that we [Summit] would be obligated to in one document." [Doc. 94-6 at 2.] Osterman conveyed Summit's request internally stating: "The client has asked for a copy to review the T&Cs [terms and conditions] in advance of signing our new proposal on the table." [Doc. 94-4 at 5; Doc. 94-7 at 2.] He received the following response:

> [A] copy of the signature page is not available for Agreement #91V137 that was put in place in 1992. The screen print below shows that the customer was under VS 00. Here is a blank copy (see attachment) of that particular version, which shows the T&C of vs 00, which would have been the original version of the ICA that originated in 1991.

[Doc. 94-7 at 1.]  Below the text of the email is a "screen shot" from IBM's contract database that purports to show that IBM Customer Agreement #91V137, had an "accept date" of "09/92," was based on form Z125-4575-00, and was an "active" agreement corresponding to Summit Electric Supply Company.  [Doc. 94-7 at 2.]  Mr. Osterman reported to Mr. Seward that IBM did not have the "physical document," gave Seward the agreement number, and left it to Summit to attempt to locate the document in its own contract files.  [Doc. 94-4 at 7.]  Beginning around the same time, Mr. Osterman's cover letters omitted the reference to the "IBM Customer Agreement" that was included in his initial cover letter.  [Docs. 94-8 (letter dated Feb. 7, 2005), Doc. 94-9 (letter dated Feb. 28, 2005), Doc. 94-10 (letter dated Mar. 11, 2005), Doc. 94-11 (letter dated Mar. 18, 2005), Doc. 94-12 (letter dated Mar. 21, 2005).]  Mr. Osterman did not provide Summit with the "blank" form Z125-4575-00, because he understood that Seward wanted to see the signed version.  [Doc. 94-4 at 7.]  To this date, neither party has been able to locate a signed version of the ICA that Summit purportedly signed in 1992.

Summit's Vice President and Chief Information Officer, Steve Vandewater, executed the final agreed version of the Statement of Work ("SOW") on behalf of Summit on March 21, 2005.  [Doc. 101-3 at 6, 9.]  The following statement appears immediately above Mr. Vandewater's signature:

> Each of us agrees that the complete agreement between us about these Services will consist of 1) this Statement of Work and 2) the IBM Customer Agreement or IBM Agreement for Services, as applicable, (or any equivalent agreement signed by both of us).

[Doc. 101-3 at 9.]   The body of the SOW also refers to the IBM Customer Agreement. Section 3.2 of the SOW, entitled "Project Scope," states as follows:  "This section defines the scope of work to be accomplished by IBM under the terms and conditions of the IBM Customer Agreement (Agreement Number ICA # 91V137)."  [Doc. 101-4 at 2.]

## II.   <u>ANALYSIS</u>

### A.   <u>Standard of Review</u>

Under Fed. R. Civ. P. 56©, the Court may enter summary judgment when the motion papers, affidavits, and other evidence submitted by the parties show that no genuine issue exists as to any material fact, and that the moving party is entitled to judgment as a matter of law.  A "genuine issue" exists where the evidence before the Court is of such a nature that a reasonable jury could return a verdict in favor of the non-moving party as to that issue.  <u>See Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-52 (1986).  A fact is "material" if it might affect the outcome of the case.  <u>See</u> <u>id.</u> at 248.

When the movant is also the party bearing the burden of persuasion on the claim or defense for which he or she is seeking summary judgment, the movant must show that the record as a whole satisfies each essential element of that claim or defense in such a way that no rational trier of fact could find for the non-moving party.  <u>See</u> <u>19 Solid Waste Dep't Mechanics v. City of Albuquerque</u>, 156 F.3d 1068, 1071 (10th Cir. 1998); <u>Newell v. Oxford Mgmt., Inc.</u>, 912 F.2d 793, 795 (5th Cir. 1990); <u>United Missouri Bank of Kansas City, N.A. v. Gagel</u>, 815 F. Supp. 387, 391 (D. Kan. 1993).  But when the movant does not bear the

burden of proof as to the claim or defense at issue in the motion, then judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670-71 (10th Cir. 1998).

Applying this rule to a party's assertion of an affirmative defense, the Tenth Circuit has reasoned that: "A defendant may use a motion for summary judgment to test an affirmative defense which entitles that party to a judgment as a matter of law." Hutchinson v. Pfeil, 105 F.3d 562, 564 (10th Cir. 1997). When a defendant seeks summary judgment on the basis of an affirmative defense, the defendant bears the initial burden of demonstrating that no disputed material fact exists regarding the affirmative defense asserted. Id. at 564. When such a defense depends upon the interpretation of a contract, the "party seeking affirmative relief based upon its interpretation necessarily bears the burden of establishing that its interpretation controls." Farmington Police Officers Ass'n Commc'n Workers of Am. Loca. 7911 v. City of Farmington, 2006-NMCA-077, ¶ 16, 139 N.M. 750, 137 P.3d 1204 (citing Frigaliment Importing Co. v. B.N.S. Int'l Sales Corp., 190 F.Supp. 116, 121 (S.D.N.Y. 1960)). "If the defendant meets this initial burden, the plaintiff must then demonstrate with specificity the existence of a disputed material fact. If the plaintiff fails to make such a showing, the affirmative defense bars his claim, and the defendant is then entitled to summary judgment as a matter of law." Hutchinson, 105 F.3d at 564.

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  See Celotex, 477 U.S. at 324. "To survive summary judgment, 'nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient.'" Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995) (quoting Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir.1991)).  Thus, "[h]earsay testimony cannot be considered" in ruling on a summary-judgment motion. Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995); see also Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995) (applying this rule to inadmissible hearsay testimony in depositions).

The Court may, however, consider any undisputed material facts set forth in the motion papers which are deemed admitted by operation of D.N.M. LR-Civ.56.1.  See LaMure v. Mut. Life Ins. Co. of N.Y., 106 F.3d 413, 1997 WL 10961, at *1 (10th Cir. 1997) (unpublished disposition); Smith v. E.N.M. Med. Ctr., 72 F.3d 138, 1995 WL 749712, at *4 (10th Cir. 1995) (unpublished disposition); Waldridge v. American Hoechst Corp., 24 F.3d 918, 920-24 (7th Cir.1994) (approving use of local rule similar to D.N.M. LR-Civ. 56.1(b)). "Admissions in a party's pleadings or in a pretrial order are similarly binding." Underberg v. United States, 362 F. Supp. 2d 1278, 1283 (D.N.M. 2005).  "However, a party generally may not introduce statements from its own answers to interrogatories or requests for

admission as evidence because such answers typically constitute hearsay when used in this manner." Id. (citations omitted).  The Court also does not consider evidence submitted for the first time in a reply brief.  See Beaird v. Seagate Technology, Inc., 145 F.3d 1159, 1164-65 (10th Cir. 1998).

Apart from these procedural and evidentiary limitations, it is not the Court's role to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

**B.**      **The Limitation of Liability Clause**

IBM argues that when Summit agreed to the SOW, it also agreed to the ICA which the SOW incorporated by reference.  Section 1.10 of the ICA, entitled "Limitation of Liability," states as follows:

> Circumstances may arise where, because of a default on our part or other liability, you are entitled to recover damages from us.  In each such instance, regardless of the basis on which you are entitled to claim damages from us, we are liable only for:
>
> 1.  payments referred to in our patent and copyright terms described above;
>
> 2.  bodily injury (including death), and damage to real property and tangible personal property; and
>
> 3.   the amount of any other actual loss or damage, up to the greater of $100,000 or the charges (if recurring, 12 months' charges apply) for the

12

Product or Service that is the subject of the claim.

This limit also applies to any of our subcontractors and Program developers. It is the maximum for which we are collectively responsible.

**Items for Which We are Not Liable**

Under no circumstances are we liable for any of the following:

1. third-party claims against you for losses or damages (other than those under the first two items listed above);

2. loss of, or damage to, your records or data; or

3. economic consequential damages (including lost profits or savings) or incidental damages, even if we are informed of their possibility.

[Doc. 94-2 at 2–3.][3]

According to IBM, the SOW expressly incorporates the ICA and, further, Summit was actually aware that terms and conditions governing the relationship between the parties would be contained in a separate document. IBM also argues that Summit repeatedly agreed to be bound by the ICA throughout the parties' thirteen-year course of dealing since the ICA was allegedly first signed. Finally, IBM refers the Court to a 2007 unpublished decision from the Western District of Michigan, Irwin Seating Co. v. IBM, No. 1:04C-CV-568, 2007 WL 2351007 (W.D. Mich Aug. 15, 2007), which IBM claims is factually similar and provides guidance here. The decision in Irwin Seating was recently affirmed on appeal. See Irwin Seating Co. v. IBM, 306 Fed. Appx. 239 (6th Cir. 2009) (unpublished disposition).

Summit claims that when it signed the SOW, it believed that the entire transaction

---

[3] The document in dispute is attached as Exhibit 1 to Summit's Motion. [Doc. 94-2.]

with IBM was embodied in the SOW.  Summit further contends that IBM has failed to meet

its burden of showing that the parties agreed to the ICA because it has not produced a copy

of the ICA with a signature by Summit's authorized representative, and that IBM has failed

to lay the proper foundation to admit "Exhibit 1"—the document IBM claims is the version

of the ICA that Summit signed.  Summit also points out that Exhibit 1, by its terms, appears

to require a signature before it is effective.  Summit further asserts that IBM had "superior

knowledge" in advance of the execution of the SOW that there was no signed Customer

Agreement and that Summit was unaware of its terms.  According to Summit, IBM's

allegedly superior knowledge imposed a duty to disclose, and its failure to do so amounts

to fraudulent conduct.

Summit also points to "surrounding circumstances" to support an inference that the

parties did not intend for the ICA to apply.  The circumstances allegedly indicating the

absence of mutual assent are: (1) that neither party negotiating and drafting the SOW knew

of the existence of the ICA or its terms and conditions; (2) the SOW and the ICA are not

contemporaneous and do not relate to the same transaction; (3) the reference to the ICA is

not sufficiently specific to eliminate doubt as to its identity.  Finally, Summit attempts to

distinguish the Irwin Seating case relied upon by IBM.

Because the ICA contains a New York choice-of-law provision, and the parties cite

some New York law, the Court must clarify which State's substantive law applies here.

Jurisdiction is premised on diversity.  Thus, as a general rule, the Court must apply the laws

14

of the State of New Mexico.  See Tucker v. R.A. Hanson Co., 956 F.2d 215, 217 (10th Cir.

1992) (citing Erie R.R. Co v. Tompkins, 304 U.S. 64, 78 (1938)).  When "considering the

meaning and validity of contracts, New Mexico courts normally look to the place of

contracting for the applicable law."  Tucker, 956 F.2d at 217 (citing Miller v. Mut. Benefit

Health, 76 N.M. 455, 457, 415 P.2d 841, 843 (1966)).

       The parties have not specifically addressed the choice-of-law issue in their motion

papers, nor have they directed the Court to any evidence indicating where the SOW was

executed.  The record does not show that the SOW was executed in New York.  Summit is

located in New Mexico, and in the absence of evidence to the contrary the Court will

presume that it was executed in this State.  For that reason, the Court looks primarily to New

Mexico law, although the principles of contract interpretation at issue here, such as

incorporation by reference, appear to be fairly uniform across other states.  Cf. Liberty USA

Corp. v. Buyer's Choice Ins. Agency LLC, 386 F. Supp. 2d 421, 425 (S.D.N.Y. 2005)

(concluding that a court need not engage in a conflict-of-laws analysis when "the law of both

jurisdictions is substantively the same").

       While the Court looks to substantive state law for principles of contract interpretation,

federal law continues to govern the procedural posture of this litigation.  See Sims v. Great

Am. Life Ins. Co., 469 F.3d 870, 879-83 (10th Cir. 2006); Blanke v. Alexander, 152 F.3d

1224, 1231 (10th Cir. 1998).  Under Fed. R. Civ. P. 56, IBM bears the initial burden of

demonstrating that no disputed fact exists regarding its affirmative defense.  See Johnson v.

Riddle, 443 F.3d 723, 725 n.1 (10th Cir. 2006). This burden involves demonstrating that the terms it seeks to apply, which are contained in the ICA, are part of the contract.

First, IBM must demonstrate that, when executing the SOW, the parties effectively incorporated a document that was neither attached nor executed contemporaneously with the SOW. Second, if IBM demonstrates that the parties did incorporate a document by reference, IBM must establish the identity of the document, *i.e.*, that the document is the ICA proffered as Exhibit 1.

### 1. **Incorporation by Reference**

The law is clear that parties to a contract may incorporate other documents by reference, even when such documents are unsigned and not contemporaneous:

> Generally, all writings which are part of the same transaction are interpreted together. One application of this principle is the situation where the parties have expressed their intention to have one document's provisions read into a separate document. So long as the contract makes clear reference to the document and describes it in such terms that its identity may be ascertained beyond doubt, the parties to a contract may incorporate contractual terms by reference to a separate, noncontemporaneous document, including a separate agreement to which they are not parties, and including a separate document which is unsigned.

Richard A. Lord, Williston on Contracts § 30:25 (4th ed. 2007); see also Murphy Oil USA v. Wood, 438 F.3d 1008, 1015 & n.4 (10th Cir. 2006) (noting that where "specific" contract references and incorporates "general" contract, the two must be read together); Brown v. Jimerson, 95 N.M. 191, 191,  619 P.2d 1235, 1235 (1980) (noting that incorporation by reference renders personnel regulations part of employment contract). Thus, "[w]here the

16

language of an agreement clearly and unambiguously expresses the intent of the parties" to incorporate a document by reference, the "court must give effect to the parties' agreed upon intent." Trujillo v. CS Cattle Co., 109 N.M. 705, 709, 790 P.2d 502, 506 (1990).

In this case, the SOW itself expressly defines the components of the parties' agreement. It states that the "complete agreement" consists of two parts: one component is the SOW; the second component is another, separate "agreement." [Doc. 101-3 at 9.] This integration clause is consistent with the context of the contract, which reflects IBM's practice of using two documents—a transaction document and a relationship document. By this language, including the use of the numbers "1" and "2," connected by the conjunction "and," the parties clearly expressed their intent to incorporate a relationship document as part of the contract. According to the terms of the SOW, the incorporated relationship document that comprises the second part of the parties' agreement is either the IBM Customer Agreement, the IBM Agreement for Services, or any equivalent agreement signed by both parties. [Doc. 101-3 at 9.] Reading the SOW as a whole, and the signature page together with the Project Scope, it becomes apparent that the SOW expressly identifies this second agreement as "the IBM Customer Agreement (Agreement Number ICA # 91V137)." [Doc. 101-4 at 2.]

IBM relies on Irwin Seating Co. v. IBM, No. 1:04C-CV-568, 2007 WL 2351007 (W.D. Mich Aug. 15, 2007), to support the proposition that the SOW clearly manifests an intent to incorporate a relationship document, and that there is no basis for concluding that

the SOW alone constituted the entire agreement between the parties.   See id., 2007 WL 2351007, at *9–10, aff'd, 306 Fed. Appx. at 245.  The Court agrees with this proposition and notes that the facts of Irwin Seating are similar to this case with respect to the ICA's incorporation into the SOW.[4]

Moreover, Summit does not dispute that the SOW at issue in this case is a binding contract.  Summit also agrees, as a general matter, that parties to a contract may incorporate other documents by reference.  Summit does not contend that the SOW is ambiguous in this respect.  It also is undisputed that the SOW is—according to IBM's usual manner of contracting—the "transaction" document.  In light of these undisputed facts and the relevant law, the Court concludes that the SOW reflects the parties' intent to incorporate an IBM relationship document by reference, and specifically ICA # 91V137.

Summit's contention that it did not agree to terms and conditions contained in a separate document is at odds with the unambiguous language of the SOW.  IBM has demonstrated through basic principles of contract interpretation that the SOW, which is undisputedly a binding agreement, unambiguously incorporates a second document:  ICA #91V137.  The next question, therefore, is whether IBM has met its burden of establishing that the incorporated document (ICA #91V137) is the document proffered as Exhibit 1.

---

[4]The Court notes that Irwin Seating contains an alternative holding that is factually distinguishable from the present case because it rests on the presence of an "equivalent document" signed by both parties.  See Irwin Seating, 306 Fed. Appx. at 245.  Nothing in that alternative holding, however, detracts from the main holding that the ICA was incorporated by reference into the SOW.  See id.

### 2.  **The Business-Records Exception to the Hearsay Rule**

To establish the identity of ICA #91V137, and also to show that Summit signed the document, IBM  has offered a "screenshot" from its CMCAR contract database.  The screenshot purports to show that ICA #91V137 is associated with Summit and corresponds to IBM form number Z125-4575-00.  [Doc. 101-5 at 4.]

Summit  correctly asserts that the screenshot and the evidence laying the foundation for its admission constitute extrinsic evidence.  [Doc. 113 at 17.]  Under New Mexico law, however, extrinsic evidence can be used to give meaning to the terms of a contract.  See Sanders v. Fedex Ground Package Sys., Inc., 2008-NMSC-040, ¶¶ 25-26, 144 N.M. 449, 188 P.3d 1200 (holding extrinsic evidence admissible where used to give meaning to contract terms, rather than to contradict or override its terms); Korff v. Corbett, 794 N.Y.S. 2d 374,  377 (App. Div. 2005) (similar).  As explained in further detail below, IBM presents its extrinsic evidence concerning the "screenshot" to give meaning to the terms "IBM Customer Agreement" and "ICA #91V37" as they appear in the other contract documents.  Thus, IBM's extrinsic evidence is offered for a permissible purpose under the rules of contract interpretation.

The Court next examines whether such extrinsic evidence is also admissible under the Federal Rules of Evidence and may therefore be considered in determining whether IBM is entitled to summary judgment on its "limitation of liability" defense.  The admissibility of such evidence presents a preliminary question of law that the Court must answer pursuant

to Fed. R. Evid. 104, rather than a factual question for the jury that is reviewed within the parameters of Fed. R. Civ. P. 56.   Under Fed. R. Evid. 104, the Court shall admit the screenshot if the evidence used to lay the foundation for its admission is sufficient to support a finding that the conditions of the business-records exception are fulfilled.   See Fed. R. Evid. 104(b).

The screenshot is an out-of-court statement offered to prove the truth of the matter asserted, and therefore it is hearsay.   See Fed. R. Evid. 801©.   Nevertheless, the screenshot may be admitted under the business records exception if IBM lays the proper foundation. See Fed. R. Evid. 803(6); United States v. Ary, 518 F.3d 775, 786 (10th Cir. 2008); see also Hardison v. Balboa Ins. Co., 4 Fed. Appx. 663, 666 (10th Cir. 2001).

Rule 803(6) exempts from hearsay exclusion:

A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, as shown by the testimony of the custodian or other qualified witness[.]

Fed. R. Evid. 803(6).   The Tenth Circuit has interpreted this rule to mean that:

"Computer business records are admissible if (1) they are kept pursuant to a routine procedure designed to assure their accuracy, (2) they are created for motives that tend to assure accuracy (*e.g.* not including those prepared for litigation), and (3) they are not themselves mere accumulations of hearsay."

Trans-Rim Enters. (USA), Ltd. v. Adolph Coors Co., 52 F.3d 338, 1995 WL 231381, at *4 (10th Cir. 1995) (unpublished disposition quoting United States v. Hernandez, 913 F.2d

1506, 1512 (10th Cir. 1990)); see also United States v. Cestnik, 36 F.3d 904, 909–10 (10th Cir. 1994).  The foundation for the business record hearsay exception "may be established by anyone who demonstrates sufficient knowledge of the record keeping system that produced the document."  Hardison, 4 Fed.Appx. at 670.

In this case, Summit asserts that IBM has not laid the foundation to admit the screenshot under the business records exception.  [Doc. 113 at 17–18.]  Summit contends that IBM cannot rely on a former employee to "vouch" for the document when that employee received the information from unknown persons and simply entered the data from a summary or abstract prepared by a sales representative.  [Doc. 113 at 17.]  Summit also points to deposition testimony from which it infers that the IBM employees responsible for creating and maintaining the company's business records could have made a mistake entering data and may lack personal knowledge of an "executed document identified as ICA #91V137."  [Doc. 113 at 17-18.]

To overcome these objections, IBM offers the declaration and testimony of Harry Gornick, its Business Controls Program Manager.  [Doc. 101-2 (deposition); Doc. 101-5 (declaration).]  Mr. Gornick has been employed at IBM for over 24 years and has "worked extensively with IBM's record databases, including those containing IBM contract forms and customer records."  [Doc. 101-5 at 1.]  He explains that IBM has, since at least 1991, followed a procedure for keeping track of relationship agreements.  [Doc. 101-2 at 3.]  When a new customer signs a relationship agreement, the agreement is "registered" in a computer

database called "CMCAR." [Doc. 101-2 at 3.] The reason relationship documents are registered is because IBM believes the relationship document will be used throughout the life of the relationship between IBM and the customer. [Doc. 101-2 at 3.] According to Mr. Gornick, IBM teams that subsequently receive transactions documents will check the CMCAR database to determine whether the customer has an ICA or equivalent relationship agreement that would allow fulfillment of the product or service required by the transaction document. [Doc. 101-2 at 3.] The CMCAR database allows users to search by customer and retrieve a listing of all agreements the customer has registered. [Doc. 106-8.]

Mr. Gornick explained that someone on the "fulfillment team" or someone on the administrative staff enters the data when a new relationship document is received. [Doc. 101-2 at 3.] Prior to the advent of technology enabling the storage of documents electronically, the agreements were kept in file cabinets. [Doc. 101-2 at 3.]

Mr. Gornick further declares that he has reviewed the data relating to Summit in IBM's CMCAR database, and the "database shows that Agreement #91V137 refers to IBM Customer Agreement Form Z125-4575-00." [Doc. 101-5 at 1.] He states that this information has been in the CMCAR database since 1992, and is reflected in the screenshot that is attached as an exhibit to his declaration. [Doc. 101-5 at 1, 4.]

IBM also has provided the deposition testimony of Angela Horwitz, who was a college student and part-time employee at IBM from 1990 through 1994. [Doc. 106-4 at 1.] Ms. Horwitz was on the administrative/clerical staff and her duties included entering data

22

regarding new customer contracts into the computer.  [Doc. 106-4 at 2.]  Her employee

number is associated with the record entry for Summit.  [Doc. 106-4 at 5, 7.]  Ms. Horwitz

does not have a specific recollection of entering data related to Summit, but she explained

the procedure she utilized generally for entering new customer agreement data.  [Doc. 106-4

at 2.]  She would receive the "hard copy" contract documents, typically from a marketing

representative in the field, and enter information directly from the documents into various

fields on a computer screen.  [Doc. 106-4 at 2.]  Fields that Ms. Horwitz entered directly

from the documents included "agreement number," "acceptance date," and "form number."

[Doc. 106-4 at 3–4, 9.]  Other fields, such as the description of the form, would be provided

by the computer once the form number or other data was entered.  [Doc. 106-4 at 4.]  Ms.

Horwitz also testified that she always attempted to enter data "as accurately as possible," and

that any mistakes would have been "very irregular."  [Doc. 106-4 at 5.]  Her performance

evaluations were always "very satisfactory."  [Doc. 106-4 at 6.]

Based on this evidence, the Court concludes that IBM has laid the proper foundation

for admission of the screenshot as a business record pursuant to Fed.R.Evid. 803(6) and that

the record in question is trustworthy.  The testimony of Mr. Gornick and Ms. Horwitz

described above demonstrates that IBM's CMCAR database contains records of relationship

agreements that have been signed by customers.  The records are kept in the regular course

of IBM's business and not manufactured *post hoc* for litigation purposes.  Mr. Gornick and

Ms. Horwitz each demonstrated knowledge of the record keeping system and described a

routine procedure for entering data that is designed to assure accuracy.  Furthermore, the motive for keeping the records is to ensure that a relationship agreement is in place for each customer, and that it is the proper relationship agreement corresponding to the services or products to provided.  Finally, there is no indication that the records are accumulations of hearsay, because Ms. Horwitz testified that she took the agreement numbers and form numbers directly from her observation of the hard-copy documents.

Contrary to Summit's arguments, "there is no requirement that the party offering a business record produce the author of the item." Hardison, 4 Fed.Appx. at 669–70 (quoting FDIC v. Staudinger, 797 F.2d 908, 910 (10th Cir. 1986)).  "Instead, a foundation for the business-record hearsay exception may be established by anyone who demonstrates sufficient knowledge of the record keeping system that produced the document." Id. at 669–70 (testimony of corporate officer explaining how computer system records are created and entered sufficient to lay foundation for business records exception for computer-generated insurance cancellation notices); Trans-Rim Enters., 52 F.3d 338, 1995 WL 231318, at *4 (testimony of administrative manager regarding design of computer-sales file and creation of invoices sufficient to lay foundation to admit computer printout of chart summarizing invoices); Cestnik, 36 F.3d at 910 (testimony of records custodian concerning how computer records are created sufficient to lay foundation for business records exception for money transfer records).  The speculative possibility that Ms. Horwitz "might" have made a mistake entering data does not affect the admissibility of the evidence, and the Court

is satisfied that the source of information as well as the method or circumstances of preparation do not indicate a lack of trustworthiness. See Fed.R.Evid. 803(6).

Having determined that IBM's screenshot and associated deposition testimony are admissible, the Court further determines that, for purposes of summary judgment under Fed. R. Civ. P. 56, IBM has met its burden of proving that the parties' SOW incorporates IBM Customer Agreement (ICA) #91V137 containing the "limitation of liability" clause at issue here. IBM has met its summary-judgment burden by proffering admissible evidence that the parties incorporated a "relationship agreement" by reference. Mr. Gornick's declaration, as well as the "screenshot," further establish that ICA #91V137 corresponds to IBM Form Z125-4575, which is attached to Mr. Gornick's declaration, and also as Exhibit 1 to Summit's Motion. [Doc. 94-2; Doc. 101-5 at 5.] Not only does this evidence establish the identity of ICA #91V137, it also establishes that Summit signed an ICA, since only signed relationship documents are "registered" in the CMCAR database.

Because the Court concludes that IBM has met its burden based on this evidence alone, it is unnecessary to consider whether IBM also may rely on extrinsic evidence concerning the parties' prior course of dealing, or whether such extrinsic evidence is admissible in this context. The question presented on summary judgment is not whether Summit agreed to be bound by the ICA in its previous dealings with IBM, but whether the ICA was incorporated into the current contract. IBM has answered the latter question in the affirmative without the need for evidence of a past course of dealing.

Having concluded that IBM has met its burden of proof with respect to the "limitation of liability" defense, the burden shifts to Summit to raise a material issue of fact that would preclude summary judgment in IBM's favor on this defense. To rebut this defense, Summit also relies primarily on extrinsic evidence, including numerous and voluminous exhibits consisting of letters and deposition testimony that fall outside the four corners of the contract.

### 3.  **Summit's Extrinsic Evidence and IBM's Motion to Strike**

IBM has moved to strike such evidence on the grounds that it violates the parol evidence rule and is otherwise inadmissible in this context.[5]  [Doc. 107.]  To support its motion to strike, IBM correctly cites the general rule that extrinsic evidence is not admissible to modify or contradict an unambiguous contract.  Sanders, 2008-NMSC-040, ¶ 24; City of Sunland Park v. Harris News, Inc., 2005-NMCA-128, ¶ 14, 138 N.M. 588, 124 P.3d 566. Though Summit argues that the parties did not intend to incorporate the IBM Customer Agreement, Summit does not contend that the SOW is ambiguous.[6]  Furthermore, independent examination of the SOW also leads to the conclusion that it is unambiguous.

---

[5]Summit objects to IBM's motion to strike as an impermissible attempt to supplement the briefing on its summary-judgment motion.  The Court agrees that insofar as IBM's motion to strike merely states objections to Summit's characterization of the evidence, such objections are appropriately addressed in the context of the parties' cross-motions for summary judgment. Accordingly, the Court's discussion of IBM's motion to strike focuses on those items of evidence that IBM seeks to strike as inadmissible.

[6] Though Summit "disputes that the SOW unambiguously incorporates Exhibit 1," Summit does not point to any supposed ambiguity in the language of the SOW, such as would warrant consideration of parole evidence.  [Doc. 120 at 5.]

Here, Summit offers extrinsic evidence to show—despite the unambiguous language of the SOW—that the parties did not intend to incorporate the ICA.

Unlike IBM, whose extrinsic evidence is offered to explain the meaning of the terms that expressly appear in a contract, Summit's extrinsic evidence is offered for the purpose of contradicting the express terms of the contract.  Extrinsic evidence offered for the former purpose is permissible under the law of contracts, while extrinsic evidence offered for the latter purpose is not admissible.[7]  Thus, as a threshold matter, the Court agrees with IBM that Summit's evidence largely violates the parol evidence rule and cannot be considered in determining whether IBM is entitled to summary judgment as a matter of law on its "limitation of liability" defense.

Even if the Court were to consider Summit's evidence, none of it raises a fact issue as to the parties' intent to incorporate a document or the identity of the document so incorporated.  Summit's primary argument against application of ICA #91V137 is that IBM has failed to produce a signed copy.  [Doc. 94 at 15.]  Summit asks the Court to draw the following three inferences from the absences of a signed copy of the ICA: (1) there is no evidence of mutual assent; (2) signature is a condition precedent to application of the SOW; and (3) IBM knew before the SOW was signed that it did not have a signed ICA.  [Doc. 94 at 18–19.]  Summit also argues that the ICA is an impermissible "evergreen" agreement.

---

[7]The Court also may examine extrinsic evidence to determine whether an ambiguity exists.  City of Sunland Park, 2005-NMCA-128, ¶ 13.  In this case, however, neither party contends the SOW is ambiguous, nor does it appear to be ambiguous upon independent examination.

The law does not support these contentions in the context presented here.  First, the evidence of mutual assent is Summit's signature on the SOW.  By signing the SOW, Summit agreed to its terms, including those terms incorporated by reference.  Summit's argument regarding the failure to produce a signed ICA ignores the principle that a document need not be signed for parties to incorporate it into a contract by reference.  See Williston on Contracts, supra §30:25; Armstrong v. Fed. Nat'l Mortgage Ass'n, 796 F.2d 366, 371 & n.4 (10th Cir. 1986) (noting that servicing contract effectively incorporated by reference supplement that did not yet exist when servicing contract was signed);  Brown, 95 N.M. at 191, 619 P.2d at 1235 (noting that personnel regulations were incorporated by reference into employment contract).

Because Summit signed a SOW which expressly incorporated another document by reference, the facts of the present case are distinguishable from Mariposa Farms, LLC v. Wesfalia-Surge, Inc., No. 03cv779  JC/LAM, 2005 WL 6104101, at *4. (D.N.M. Apr. 7, 2005).  In Mariposa Farms, the defendant argued for application of a limitation of liability clause contained in an agreement the plaintiff had not signed.  The Court declined to grant summary judgment, finding lingering questions of material fact as to the terms of the agreement between the parties.  See id.  Here, however, there is no dispute that Summit signed the SOW and is bound by it.  Indeed, Summit's breach-of-contract claim is expressly based on the SOW.  [Doc. 29, ¶¶ 9, 21–22.]

To support its contention that a signed ICA is a condition precedent to application of

the SOW, Summit points to language on the ICA attached as Exhibit 1 to IBM's motion, which states that: "By signing below for our respective Enterprises, each of us agrees to the terms of this Agreement.  Once signed...all Products and Services you order under this Agreement are subject to it."  [Doc. 94-2 at 1.]  Summit asserts that this language means it cannot be bound by the ICA unless it is signed.  Once again, however, a document need not be signed for the parties to effectively incorporate it by reference into another agreement that *is* signed.  The parties can choose to incorporate any separate, unsigned document into their signed SOW, even if the separate document would otherwise require a signature if it had not been so incorporated.

And even if the Court were to assume for purposes of argument that Summit's signature on the ICA were required, IBM has produced undisputed evidence that Summit signed the ICA in 1992.  Though neither party can locate the signed document, the screenshot from IBM's CMCAR database, along with the Mr. Gornick's testimony, establish that such a document did exist at one time.  Summit has failed to proffer any competent evidence to the contrary.  Under these circumstances, Summit cannot rebut this evidence of a signed agreement merely by stating that no one at Summit remembers seeing or signing the document prior to this litigation.

In this regard, Summit asserts that the former Summit employee who IBM claims signed the ICA, Al Risinger, did not have authority to do so, and that those who did have authority do not recall ever signing or seeing it.  [Doc. 94 at 10–11.]  However, even if Mr.

Risinger did not have authority to bind Summit, Mr. Vandewater did, and it was Mr. Vandewater who signed the SOW, binding Summit to all the terms contained therein, including documents such as the ICA which were incorporated by reference.

For the same reasons that Summit asserts in its effort to forbid IBM's use of extrinsic evidence to show a past course of dealing, Summit cannot rely on such evidence to draw inferences from the fact that some other past customers of IBM did not sign an ICA or "are not willing to sign the entire ICA."  [Gorlick Dep., Doc. 94-22 at 2.]  The issue here is whether *Summit* signed an ICA, not some other past customer of IBM.  The fact that some customers do not sign an ICA, but some other relationship document instead, has no bearing on whether *Summit* signed an ICA, or whether an ICA was incorporated into Summit's SOW.  If anything, this testimony simply supports the undisputed contention that IBM always uses some type of relationship document in its transactions, whether it be an ICA, or another type.

Summit's third argument is that IBM knew before the SOW was signed that it did not have a signed ICA.  Summit offers evidence (in the form of deposition testimony) that Mr. Seward, its CFO at the time, asked Mr. Osterman to provide a "complete package" and that Mr. Osterman did not provide the ICA.  [Doc. 94-6.]  Mr. Osterman testified that he unsuccessfully attempted to locate a signed copy of the ICA, and that he was only able to obtain the unsigned form of ICA that IBM's CMCAR database indicated had been signed by Summit.  Believing that the customer wanted a signed copy, Mr. Osterman did not

provide the "blank" form to Mr. Seward, and instead advised him that a signed copy was unavailable at IBM, and that Summit should check its own files.  [Doc. 94-4 at 7.]  Summit also offers a series of cover letters written by Mr. Osterman showing that the reference to the IBM Customer Agreement was dropped at about the same time that these communications took place.  [Docs. 94-3, 94-8 through 94-12.]

Summit characterizes Mr. Osterman's conduct in failing to provide the "blank" copy as "withholding" the ICA.  Summit further asserts that such conduct shows that IBM knew it did not have a signed copy and deliberately withheld this information from Summit.  According to Summit, IBM had a duty to disclose, arising out of its allegedly superior knowledge that Summit was acting under a mistaken belief.  [Doc. 94 at 17–18.]  To support this contention, Summit cites Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co., 170 F.3d 985 (10th Cir. 1999).

Woodworker's Supply does not stand for the proposition that the duty to disclose arises in contract.  Instead, Woodworker's Supply merely cites Krupiak v. Payton, 90 N.M. 252, 561 P.2d 1345 (1977), for the proposition that the failure to disclose is an element of a fraud claim, not the affirmative defense presented by the "limitation of liability" clause. Woodworker's Supply, Inc., 170 F.3d at 994 (citing Krupiak, 90 N.M. at 253, 561 P.2d at 1346).  Though Summit's fraud claim is not at issue here, to the extent Summit is claiming IBM acted fraudulently, then the burden is on Summit to prove this claim.[8]

---

[8] IBM contends that Summit's allegations of fraud should not be considered here.  [Doc. 106 at 7–8.]  As IBM points out, claims of fraud and mistake must be plead with particularity.

Summit's argument also places great significance on the fact that the ICA was not present at the signing of the SOW, nor was it attached to the SOW.  Though this fact is not contested, it is not relevant in light of the case law and other authority regarding incorporation by reference.  Regarding Summit's allegations of "withholding" by IBM, there is no evidence that IBM believed Summit was acting under a mistaken belief—or that Summit was in fact acting under a mistaken belief.  The undisputed evidence is that Mr. Osterman informed Mr. Seward that a signed copy of the ICA could not be located.  Furthermore, even though IBM could not locate a copy of the signed document, the undisputed evidence is that IBM believed that Summit had signed an ICA, because that is what is reflected in its CMCAR database.

Second, although no signed version of the ICA was ever provided, the undisputed evidence shows that Summit knew a "relationship agreement" such as an ICA would apply.  Mr. Vandewater, the person who signed the ICA on behalf of Summit had:  (1) read the SOW "many times" and was aware that there was a reference in it to the IBM Customer Agreement, and specifically to ICA #91V137; (2) knew of IBM's practice of using two documents; (3) knew that terms and conditions could be contained in a document separate from the transaction-specific document and considered the practice "quite normal"; and (4) knew that Summit had not received a terms and conditions document with the SOW.  [Doc.

---

Fed.R.Civ.P. 9(b).  Though Summit alleged a fraud claim in its Amended Complaint, none of the allegations supporting the fraud claim concern the ICA, which is not mentioned anywhere in the Amended Complaint.  [Doc. 29.]

101-3 at 4–5.]  Despite this knowledge, Mr. Vandewater proceeded to execute the SOW.

Summit has offered no evidence that IBM fraudulently "withheld" the ICA.  As discussed above, the evidence submitted with the briefing on the parties' summary-judgment motions is that IBM believed there was a signed ICA, which could not be located, that it communicated this information to Summit, and most importantly, that Summit was aware that such a document could be used and that it was expressly incorporated into the SOW.

Summit's final argument in opposition to the "limitation of liability" clause is that the ICA is an "evergreen" contract prohibited by New Mexico law.  [Doc. 94 at 28.]  According to Summit, an "evergreen contract" is "a contract that renews itself from one term to the next in the absence of any contrary notice by one of the parties."  [Doc. 94 at 28 (citing Black's Law Dictionary (8th ed. 2004).]  Summit claims that such contracts are contrary to New Mexico public policy.

Summit's argument boils down to the proposition that a contract is not valid unless it has a definitely ascertainable termination date, which the ICA apparently does not.  However, Summit cites no New Mexico law in  reference to "evergreen contracts," let alone any New Mexico authority prohibiting them.  Instead, Summit cites Greer v. Stanolin Oil & Gas, 200 F.2d 920 (10th Cir. 1952), which does not stand for the proposition that contracts may not automatically renew.  In Greer, the question was whether the term of the lease ran from the day it was executed, or from the day it was delivered.  See id. at 922.  The Tenth Circuit simply examined the recitations in the lease, held that there was no reason to resort

33

to extrinsic evidence to determine the parties' intent,  and concluded that the term ran one year from the date of execution.  Id. at 922–23.

Summit also cites Padilla v. RRA, Inc., 1997-NMCA-004, 124 N.M. 111, 946 P.2d 1122, though it fails to explain how the case applies or supports its position regarding "evergreen contracts."   In Padilla, the New Mexico Supreme Court explained that a purported contract which has too many terms left open may indicate that the parties did not reach an agreement, and thus may fail for indefiniteness.   Id. ¶ 6 (citing Restatement (Second) of Contracts § 33 (1981)).   The New Mexico Court of Appeals also noted, however, that a court may, in appropriate circumstances, supply missing terms.  Id. ¶ 10.  Thus, Padilla does not stand for the proposition that a contract of indefinite duration is against public policy.

Summit's "evergreen" argument appears to focus on the ICA alone, rather than its relationship to the SOW.   However, the question is not whether the ICA alone is independently or indefinitely enforceable, and thus it is irrelevant whether the parties intended the ICA to govern all future transactions in the indefinite future at the time the ICA first took effect in 1992.  Rather, IBM's affirmative defense depends on whether the parties agreed to incorporate the ICA into the SOW *at the time they negotiated and executed the SOW in 2005.*  As the only reasonable inference to be drawn from the undisputed facts and evidence of record is that the SOW executed in 2005 expressly and definitely incorporates the ICA and all of its terms by reference, it follows that IBM is entitled to summary

34

judgment on its "limitation of liability" defense to Summit's breach-of-contract claim.[9]

## C.   <u>The Merger Clause</u>

IBM also seeks partial summary judgment on the grounds that Summit's tort claims (negligent misrepresentation and fraud) are barred by a merger clause contained in the ICA. [Doc. 101 at 11.]  This aspect of IBM's motion relies on the conclusion that the ICA containing the merger clause has been effectively incorporated by reference into the SOW for the reasons previously discussed with respect to the "limitation of liability" clause.

The merger clause in the ICA states that:  "This Agreement and its applicable Attachments and Transaction Document are the complete agreement regarding these transactions, and replace any prior oral or written communications between us." [Doc. 94-2 at 1.]  IBM relies on <u>Rio Grande Jewelers Supply, Inc. v. Data Gen. Corp.</u>, 101 N.M. 798, 689 P.2d 1269 (1984), and <u>Smith v. Prices Creameries</u>, 98 N.M. 541, 650 P.2d 825 (1982), to support the proposition that this merger clause bars Summit's all of tort claims in this instance.[10]  [Doc. 101 at 11–12.]

<u>Rio Grande Jewelers</u> presented the following certified question:

Whether, in a sale of goods context governed by the New Mexico Commercial Code, a commercial purchase of a computer system (hardware and programmable software) may maintain an action in tort against the seller for

---

[9]The Court does not apply the "limitation of liability" clause to Summit's fraud and UPA claims for the same reasons expressed below with respect to the merger clause.

[10]As noted above, the ICA contains a New York choice-of-law provision, but the parties do not point to any relevant differences between the laws of New York and New Mexico with respect to the merger issue.

> pre-contract negligent misrepresentations regarding the system's capacity to perform specific functions, where the subsequently executed written sales contract contains an effective integration clause, and an effective provision disclaiming all prior representations and all warranties, express or implied, not contained in the contract.

Rio Grande Jewelers Supply, Inc., 101 N.M. at 799, 689 P.2d at 1270.  The New Mexico Supreme Court answered the question in the affirmative after being persuaded that asserting a cause of action for negligent misrepresentation in this context was in direct conflict with the parol evidence rule as incorporated into the Uniform Commercial Code ("UCC").  See id. at 800, 689 P.2d at 1271.  The Court considered it significant that the Rio Grande Jewelers contract contained an integration clause stating that it was the "complete and exclusive statement" of the agreement between the parties.  Id. at 1799, 689 P.2d at 1270.

Summit contends that Rio Grande Jewelers does not apply to fraud claims and is limited to negligent-misrepresentation claims that involve the sale of goods.  Summit also cites Wilburn v. Stewart, 110 N.M. 268, 794 P.2d 1197 (1990), for the proposition that parol evidence may be considered for the purpose of showing that the formation of a contract was influenced by negligent misrepresentations, notwithstanding the holding in Rio Grande Jewelers.

The Court agrees with Summit that Rio Grande Jewelers is silent as to fraud claims.  Further, the New Mexico Supreme Court has recognized that "evidence of fraud" may provide an exception to the general rule that "the terms of contract made by the parties must govern their rights and duties."  Smith, 98 N.M. at 544, 650 P.2d at 828; accord State ex rel.

36

Udall v. Colonial Penn Ins. Co., 112 N.M. 123, 131-32, 812 P.2d 777, 785-786 (1991) (concluding that a contract's exculpatory clause did not exclude liability for fraudulent misrepresentations).  For these reasons, the Court concludes that IBM has not met its burden of showing that the fraud claim asserted in Count IV of Summit's *Amended Complaint* [Doc. 29] is barred by the ICA's merger clause.

Similarly, the Court concludes that the merger clause does not bar a statutory claim under the UPA.  New Mexico courts recognize that UPA claims are distinct from breach-of-contract claims and are more akin to fraud claims.  See Diversey Corp. v. Chem-Source Corp., 1998-NMCA-112, ¶ 17, 125 N.M. 748, 965 P.2d 332 (citing Stevenson v. Louis Dreyfus Corp., 112 N.M. 97, 99, 811 P.2d 1308, 1310 (1991)).  In particular, UPA claims require more than a simple breach of contract; they also require "a misleading, false, or deceptive statement made knowingly in connection with the sale of goods or services."  Id. Given these heightened requirements for pleading and proving UPA claims, which make them more akin to claims of fraud, it is unlikely that the New Mexico Legislature intended to allow parties to bargain away their rights under the UPA through a merger clause such as the one presented here.

The Court reaches a different conclusion with respect to the negligent misrepresentation claim asserted in Count III of Summit's *Amended Complaint*.  [Doc. 29.] Although Rio Grande Jewelers involved the UCC and a transaction in goods, it firmly supports the more general proposition that an integration clause can effectively preclude

claims for negligent misrepresentations made prior to the contract.  See Rio Grande Jewelers Supply, Inc., 689 P.2d at 1271 ("Under these circumstances, Rio Grande's claims for negligent misrepresentation can be nothing more than an attempt to circumvent the operation of the Commercial Code and to allow the contract to be rewritten under the guise of an alleged action in tort."); accord Colonial Penn Ins. Co., 112 N.M. at 132, 812 P.2d at 786 (concluding that "the parties contracted away liability for negligence in performance of contractual duties, such as the negligent misrepresentation alleged here").  Citing Rio Grande Jewelers with approval, the Tenth Circuit stated as recently as 2005 that the "rule in New Mexico is that 'the concept of freedom of contract and notions of contractually assumed duties and liabilities can act to limit general tort liability in certain circumstances when limited liability is expressly bargained for.'"  Elliott Indus. Ltd. v. BP America Prod. Co., 407 F.3d 1091, 1116 (10th Cir. 2005) (quoting Colonial Penn Ins. Co., 112 N.M. at 131, 812 P.2d at 785).  Thus, both the New Mexico Supreme Court and the Tenth Circuit have recognized that contractual limitations of liability are enforceable in New Mexico, at least with respect to contract damages and common-law negligence claims.  This authority was not abrogated by Wilburn, 110 N.M. at 270, 794 P.2d at 1199, which did not involve a merger clause and therefore did not address the effect such a clause may have on negligent misrepresentation claims.

For these reasons, the Court determines that IBM is entitled to summary judgment as a matter of law on Summit's negligent misrepresentation claim based on the merger clause

in the ICA, which is incorporated by reference in the SOW.  However, the Court denies

IBM's motion in part insofar as it seeks to preclude Summit's fraud and UPA claims based

on the merger clause.

### D. The Economic Loss Rule

IBM next asserts that the economic-loss rule provides alternative grounds for granting

summary judgment in its favor on Summit's claims for fraud, negligent misrepresentation,

and violation of the UPA.  IBM argues that courts "routinely apply the economic loss rule

to bar tort claims like Summit's; claims in which the alleged misrepresentations relate to the

product or service that is the subject of the contract, and the tort damages are the same as

those sought for breach of contract."  [Doc. 101 at 15.]  According to IBM, Summit's

complaints relate directly to the product and service that IBM contracted to provide, and

therefore are not actionable as tort claims.  Summit responds that, in New Mexico, the

economic loss rule applies only to commercial transactions for the sale of goods, and that

it does not apply to this case, which arises from a contract for services.  [Doc. 113 at 29–30.]

The New Mexico Court of Appeals first recognized the economic loss doctrine in

Utah Int'l, Inc. v. Caterpillar Tractor Co., 108 N.M. 539, 775 P.2d 741 (Ct. App. 1989).  The

Court of Appeals stated the rule as follows:  "We hold that between parties in a commercial

setting, when there is no large disparity in bargaining power, economic loss arising from a

product injuring itself cannot be recovered in a tort action for either strict products liability

or negligence in New Mexico."  Id. at 540, 775 P.2d at 742.  There have been few New

Mexico cases examining the doctrine since that holding.

There is authority from other jurisdictions to support the proposition that the economic loss rule has been applied more broadly beyond the context of commercial product-liability claims. See, e.g., Hoseline, Inc. v. U.S.A. Diversified Prods., Inc., 40 F.3d 1198 (11th Cir. 1994) (under Florida law, in case of alleged undershipment of product, a party cannot recover in tort for economic losses incurred pursuant to the terms of a written contract); Werwinski v. Ford Motor Co., 286 F.3d 661, 670–74 (3rd Cir. 2002) (predicting that under Pennsylvania law, economic loss doctrine would preclude recovery in tort for plaintiffs alleging defendants had sold or leased them automobiles with defective transmissions); Kearl v. Rausser, 293 Fed.Appx. 592, 610 (10th Cir. 2008) (holding that under Utah law, economic loss doctrine prevented recovery in tort for loss arising from contract to share proceeds of consulting practice); Sanchez v. Feretti, Inc., No. 07-4255, 2008 WL 2517177 (E.D. Pa. June 20, 2008) (under Pennsylvania law, where dealer allegedly misrepresented salvaged vehicle as having only minor damage, economic loss doctrine precludes recovery for economic losses when there is no injury to anything but the product). But cf. Cerabio LLC v. Wright Med. Tech., Inc., 410 F.3d 981, 987–90 (7th Cir. 2005) (holding that under Wisconsin law, the economic loss rule does not apply to service contracts, as well as certain circumstances of fraud in the inducement); Kaloti Enters., Inc. v. Kellogg Sales Co., 699 N.W. 2d 205, 219 (Wis. 2005) (holding that economic loss rule did not bar claims based in fraud "where the fraud is extraneous to, rather than interwoven

with, the contract"); Huron Tool & Eng'g Co. v. Precision Consulting Svcs., Inc., 532 N.W.2d 541 (Mich. Ct. App. 1995) (recognizing fraud in the inducement exception to economic loss doctrine).

New Mexico courts, however, have declined to endorse the broad reading of the economic loss rule propounded by IBM in this case. For example, the New Mexico Supreme Court has held that the economic loss rule does not bar claims for indemnification. See In re Consol. Vista Hills Retaining Wall Litigation, 119 N.M. 542, 551, 893 P.2d 438, 447 (N.M. 1995) (defective building materials case). Federal courts applying New Mexico law have reasoned that the economic loss rule did not bar tort claims in a case where a plaintiff allegedly bought a defective milking system, see Mariposa Farms, LLC, No. CIV-03-779 JC/LAM, 2005 WL 6104101, at *4, and that the economic loss rule did not bar such claims in the context of a contract for professional services, see Farmers Alliance Mut. Ins. Co. v. Naylor, 480 F.Supp.2d 1287, 1289-90 (D.N.M. 2007).

I find the reasoning of these courts to be persuasive and therefore conclude that the application of the economic loss rule that IBM proposes in this case is broader than what New Mexico law currently supports. In reaching this conclusion, I find it significant that this is not a products liability case. Although Summit claims the software was inadequate to meet its needs, the software never was fully implemented. Thus, this case is not one where an allegedly defective product resulted in physical injury or property damage, such as in the Utah International or Vista Hills Retaining Wall cases.

Second, the contract in this case involves both goods and services.  It is as much about the allegedly substandard service IBM provided, as it is about the software.  IBM has not cited any New Mexico authority for the application of the economic loss doctrine to contracts for services.  Although some jurisdictions apply the economic loss rule to cases involving services, that does not yet appear to be the case in New Mexico.  <u>See</u> <u>Naylor</u>, 480 F.Supp.2d at 1289-90.

And although IBM cites significant policy reasons for adopting a broader formulation of the economic loss rule, and such a broad formulation may be permissible under the law of other states, <u>see, e.g.</u>, <u>Level 3 Commc'n, LLC v. Liebert Corp.</u>, 535 F.3d 1146, 1162 (10th Cir. 2008) (applying Colorado law), the existing precedent governing a diversity action in the District of New Mexico does not provide sufficient authority for extending that rule to the particular circumstances of this case, which largely involves a contract for services and is not limited to a products-liability claim.  Accordingly, the Court denies IBM's motion in part insofar as it is based on the economic-loss rule.

III.   <u>**CONCLUSION**</u>

For the foregoing reasons, the Court concludes that Summit's claim for breach of contract is subject to the "limitation of liability" clause in the parties' agreement and that Summit's negligent misrepresentation claim is barred by the merger clause in that agreement.  On the other hand, neither these clauses nor the economic-loss rule provide a basis for

granting summary judgment on Summit's fraud or UPA claims at this juncture.

**IT IS THEREFORE ORDERED** that Plaintiff *Summit's Motion for Partial Summary Judgment* [Doc. 94] is **DENIED**.

**IT IS FURTHER ORDERED** that *Defendant International Business Machines Corporation's Motion for Summary Judgment* [Doc. 101] is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that *Defendant International Business Machines Corporation's Objections to Summary Judgment Evidence and Motion to Strike* [Doc. 107] is **GRANTED**.

**SO ORDERED** this 30th day of September, 2009**,** in Albuquerque, New Mexico.

_____

**M. CHRISTINA ARMIJO**
United States District Judge

43