IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

SUMMIT ELECTRIC SUPPLY
COMPANY, INC.,

      Plaintiff,

v.                                     No. CIV 07-431 MCA/DJS

INTERNATIONAL BUSINESS
MACHINES CORPORATION,

      Defendant.

## MEMORANDUM OPINION AND O R D E R

**THIS MATTER** is before the Court on *Defendant International Business Machine Corporation's Renewed Motion   Exclude Report And Testimony Of Brooks L. Hilliard* [Doc 176] and *Defendant International Business Machine Corporation's Motion To Exclude Damages Models And Testimony Of Russel D. Hiller* [Doc 210].  Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants in part and denies in part the *Motions*.

## I.      BACKGROUND

This case centers on a failed software implementation.  Plaintiff, Summit Electric Supply Company, Inc. (Summit), hired Defendant, International Business Machines Corporation (IBM), to implement an SAP business software system.  During the implementation process, relations between the companies broke down, and IBM did not complete the project.  Summit completed the implementation on its own and sued IBM to

recover damages.  Currently outstanding are  two motions challenging the admissibility of

expert testimony.

**II.      ANALYSIS**

As an initial matter, IBM maintains that Summit's proposed implementation

expert, Mr. Hilliard, has failed to abide by Fed. R. Civ. P. 26 (a)(2)(B)(ii), which requires

an expert to disclose all information that he considered in forming his opinion.

Specifically, IBM argues that in making his report, Mr. Hilliard relied on materials that

were not disclosed until the time that his deposition was taken.  [Doc 176 at 15-17]

During Mr. Hilliard's deposition, he indicated, among other things, that he "looked at

some of the preconfigured templates," that he read a book on the SAP software, that he

reviewed some of the Business Blueprint documents, and that an undisclosed matrix was

prepared comparing disputed items on the Gap List with the Business Blueprint.   [Doc

176-3 at 3-4, 7, 5, 10-11]  Summit counters that Mr. Hilliard properly disclosed the

materials that he relied upon to form his opinion and further, that any arguable

nondisclosure has not prejudiced IBM.  [Doc 187 at 28]

Rule 26(a)(2)(B)(ii)  requires that expert witnesses submit a report, containing "the

data or other information considered by the witness in forming" the expert's opinion.

This rule "imposes a duty to disclose information regarding expert testimony sufficiently

in advance of trial that opposing parties have a reasonable opportunity to prepare for

effective cross examination and perhaps arrange for expert testimony from other

witnesses."  Neiberger v. Fed Ex Ground Packages Sys., Inc., 566 F.3d 1184, 1191 (10th

Cir. 2009) (internal quotation marks and citation omitted).  When this duty is violated, the Court may impose sanctions pursuant to Fed. R. Civ. P. 37(c)(1).  <u>See</u> <u>Neiberger</u>, 566 F.3d at 1191.  IBM seeks the imposition of sanctions; however in the present case, the Court determines that  sanctions are not appropriate.

The purpose of Rule 26 expert disclosures is to permit the opposing party a "reasonable opportunity" to prepare *for trial*.  <u>See</u> <u>Neiberger</u>, 566 F.3d at 1191.  Mr. Hilliard made clear during his deposition that while he looked at the "preconfigured templates" or "transports," he did not draw any conclusions or form any opinions based on that review.  [Doc 176-3 at 3-4]  It does not appear that Mr. Hilliard conducted a secret "technical review" of the software, as IBM suggests.  He arguably revealed new sources at his deposition, but IBM is sufficiently able to track down those sources to prepare for trial.  Thus, although IBM complains of prejudice based on its inability to fully prepare for the February 19, 2009 deposition of Mr. Hilliard, IBM has had ample opportunity to prepare for trial.  Summit has indicated a willingness to supply these materials.  The supply of such documents cures any prejudice that may have resulted from Mr. Hilliard's failure to identify all of the materials that he uncovered during his investigation.

Having resolved this preliminary issue, the Court turns to IBM's challenges to Summit's expert witnesses.

**A.**      **<u>Standard of Review</u>**

Rule 702 of the Federal Rules of Evidence imposes a special gatekeeping obligation on this Court to ensure that expert testimony is not admitted at trial unless it is

both relevant and reliable.  See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999); Daubert v. Merrell-Dow Pharm., Inc., 509 U.S. 579, 592-93 (1993).  The relevance of such testimony also must be weighed against "the danger of unfair prejudice, confusion of the issues, or misleading the jury" as well as "considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed.R.Evid. 403.  While the Court is not required to consider any particular set of factors or utilize a particular procedure in making such determinations with respect to expert testimony, the Court must make *some* kind of determination on the record in order to demonstrate that it has performed its gatekeeping function.  See United States v. Velarde, 214 F.3d 1204, 1209 (10th Cir. 2000); Goebel v. Denver & Rio Grande W. R.R. Co., 215 F.3d 1083, 1087-88 (10th Cir. 2000) (Goebel I).

    As part of its gatekeeping function, and in addition to determining whether the proposed expert is qualified to offer an opinion, the Court must also determine whether (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case.  Fed. R. Evid. 702.  Reliability under Daubert is determined by examining whether the reasoning or methodology underlying the testimony is scientifically valid, and relevance is determined by whether that reasoning or methodology properly can be applied to the facts at issue.  Smith v. Sears Roebuck and Co., 232 Fed.Appx. 780, 781 (10th Cir. 2007).  An expert may not testify to legal conclusions, but "Fed.R.Evid. 704(a) allows an expert witness to testify in the form of an

opinion or inference even if that opinion or inference embraces an ultimate issue to be determined by the trier of fact." Phillips v. Calhoun, 956 F.2d 949, 952 (10th Cir. 1992).

Under this framework, IBM challenges the admissibility of Summit's experts, Brooks Hilliard and Russel Hiller.  [Doc 176; Doc 210]  The Court begins with IBM's *Renewed Motion To Exclude Report And Testimony Of Brooks L. Hilliard* [Doc 176].

## B.      Mr. Hilliard—Proposed Software Implementation Expert

IBM contends that Mr. Hilliard is not qualified to testify as an expert on the SAP R/3 software and that his proffered opinions are not based on a  reliable methodology. [Doc 176 at 3]  Each argument is addressed in turn.

## 1.      Mr. Hilliard's Qualifications

An expert may be "qualified by knowledge, skill, experience, training, or education to render an opinion." Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 969 (10th Cir. 2001) (internal quotation marks and citation omitted).  It is IBM's position that Mr. Hilliard is not qualified to testify because he does not have information about, or experience with, the details of the software that is the center of the dispute. [Doc 176 at 4-6]  Summit responds that Mr. Hilliard is not offered as a software expert, but rather as an expert on the process of software implementation.  Summit proffers that Mr. Hilliard will testify about the nexus between the product IBM promised to deliver and "what would be required by industry custom and practice."  [Doc 187 at 6]

Mr. Hilliard's qualifications are not in dispute.  He has worked as a consultant for 28 years, assisting more than 200 entities—governmental, corporate, and not-for-

profit—to select business computer systems.  [Doc 188-1 at 1-2]  Mr. Hilliard further

states that he has participated in "multiple consulting projects for businesses involved in

projects relating to the acquisition, implementation, upgrade, and use of systems and

software for use in wholesale and industrial distribution applications."  [Id. at 2]  He

earned an M.B.A. from Harvard University and an undergraduate degree in mechanical

engineering from MIT.  [Id.]  He is a Certified Management Consultant, as well as a

Certified Computer Professional.  [Id.]  He also proffers the following:

> In addition to my full-time consulting activities, I have served as a member
> of the Arizona State Bar Technology Task Force, written a book on
> computer selection (published by Dow Jones), published my own hard copy
> and electronic computer newsletters, provided commentary on computer
> issues for the nationally-syndicated MARKETPLACE news program on
> Public Radio International, conducted seminars, spoken professionally on
> various computer issues and been active in several civic organizations.

[Id.]  Although Mr. Hilliard's deposition testimony and his report indicate some lack of

familiarity with the details of the SAP software, Summit does not propose for Mr. Hilliard

to testify regarding the "technical aspects of the SAP software itself."  [Doc 187 at 6]

Instead, Mr. Hilliard's testimony will be limited to the business software implementation

process and the related industry standards.  See id. at 970 (identifying the "dispositive

question" as whether the proposed testimony fell "within the reasonable confines" of the

expert's subject area).  The Court finds Mr. Hilliard is qualified to testify on the proffered

subjects.

## 2.      Mr. Hilliard's Methodology

IBM challenges Mr. Hilliard's methodology on a number of fronts.  First, IBM contends that Mr. Hilliard employed no methodology at all.  IBM argues that to the extent that Mr. Hilliard used any methodology, it was completely of his own creation and was not based on any reproduceable standards.  Finally, IBM maintains that certain of Mr. Hilliard's individual opinions are inadmissible because those opinions constitute improper legal conclusions or state-of-mind opinions.

**a**      **Lack of Methodology**

IBM's premise is that because Mr. Hilliard did not test the software and did not access certain project management tools, he failed to use "any valid methodology to support [his] opinions."  [Doc 176 at 8]  This argument misapprehends the nature of Mr. Hilliard's expertise and his proposed testimony.  As has been explained, Mr. Hilliard will not testify regarding the intricacies of the software—his purpose is to supply an opinion regarding the selection of software to meet identified business goals and the process for a large-scale software implementation.  Summit further intends that Mr. Hilliard will provide an analysis of the implementation process that occurred in the present case as well as whether the product delivered by IBM conformed to the IBM's promises and industry standards.   To assess the current circumstances. Mr. Hilliard took the following steps:

> 1.  Met and participated in telephone calls with [Summit personnel] to discuss the SAP R/3 implementation project.
>
> 2.  Reviewed depositions of [Summit and IBM personnel] (including

attending some remotely via LiveNote) and reviewed deposition exhibits.

3.   Accessed Summation database of all documents, including searches for documents related to issues covered in this report.

4.   Reviewed Gap List spreadsheet extracted from Ascendant database.

[Doc 188-1 at 4]  Although Mr. Hilliard did not evaluate the software itself, during his deposition, he explained that such a review was not possible because Summit had continued the implementation after IBM ceased participation.  [Doc 187-5 at 13-14] Thus, the final product that IBM delivered—what existed at the time that the working relationship between the parties ended—did not exist at the time that Mr. Hilliard was engaged by Summit.  [Id.]  Evaluation of the software at the time that Mr. Hilliard was engaged by Summit would not have provided information about the quality of IBM's product.  According to Mr. Hilliard, the only way to gain insight on IBM's actual product was through documentation and the deposition testimony.  Based on this, Mr. Hilliard employed some methodology to reach his conclusions, and the next question is therefore whether this methodology was sufficiently reliable to warrant the admission of Mr. Hilliard's opinions.

**b.      Reliable Methodology**

In order for an opinion to satisfy Daubert's reliability standard, "the plaintiff must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts that satisfy Rule 702's reliability requirements."  Goebel v. Denver & Rio Grande W. R.R. Co., 346 F.3d 987, 991 (10th

Cir. 2003) (Goebel II).  Daubert listed "four nonexclusive factors" that the Court may

consider to evaluate reliability:

> (1) whether the opinion at issue is susceptible to testing and has been
> subjected to such testing; (2) whether the opinion has been subjected to peer
> review; (3) whether there is a known or potential rate of error associated
> with the methodology used and whether there are standards controlling the
> technique's operation; and (4) whether the theory has been accepted in the
> scientific community.

Id. at 991-92 (internal quotation marks and citation omitted).  These factors "do *not*

constitute a 'definitive checklist or test.'"  Kumho Tire Co., 526 U.S. at 150 (quoting

Daubert, 509 U.S. at 593).  "The  factors identified in Daubert may or may not be

pertinent in assessing reliability, depending on the nature of the issue, the expert's

particular expertise, and the subject of his testimony."  Kumho Tire Co., 526 U.S. at 150

(internal quotation marks and citation omitted).

IBM focuses on Mr. Hilliard's opinions regarding product functionality and

contends that application of these factors to Mr. Hilliard's methodology demonstrates that

his opinion is unreliable.  Specifically, IBM takes issue with two of the criterion used by

Mr. Hilliard—the "commercial quality test" and the "obvious functionality test," and

argues that these tests are (1) "nothing more than arbitrary criteria created by Mr.

Hilliard," (2) "[n]either test is employed by any other expert in the industry," and (3)

"[n]either test has been reported in scholarly literature or been subjected to peer review."

[Doc 176 at 8]

Beginning with the "commercial quality test," in his report, Mr. Hilliard

introduced the discussion with the following statement:  "If Wholesale Express had been a tested and proven offering in the spring of 2005 as it was portrayed to Summit, I would have expected it to have had a number of characteristics which the evidence does not support."  [Doc 188-1 at 22]  He went on to opine that "in many ways, the base functionality of the SAP R/3 software, when configured with the Wholesale Express pre-configured templates (as delivered to Summit) did not meet this commercial quality standard because it did not provide even minimal functionality that any wholesale distribution business would require."  [Id. at 24]  Mr. Hilliard then defined "commercial quality" as "the minimum quality level at which a business software product must perform in order to be usable by typical business customers."  [Id. at 24, n. 72]

        The basis for IBM's challenge is not entirely clear.  Mr. Hilliard offered this opinion in the larger context of the "expectations" that he would have had for a software implementation program that had been advertised as Wholesale Express was advertised.  His opinion boils down to the following:  he would expect that the software, as implemented by IBM, would work as promised and that in his opinion, it did not work when it was delivered.  IBM could be arguing that an analysis of the software as delivered is necessary before Mr. Hilliard can opine about whether it worked and that it is insufficient for Mr. Hilliard to rely on the implementation documents and the information of the parties.  The Court has already determined that software analysis is not Mr. Hilliard's proffered purpose.  IBM could be arguing that the words "commercial quality" do not constitute a sufficient standard.  Even if the "commercial quality standard" is

nebulous, the concept is not difficult to grasp, nor is it an unreliable or unworkable methodology—Mr. Hilliard need only ascertain whether the product performed as a typical business would require.  The Court finds that there is no "analytical gap" between the data—the deposition testimony and documents—and the opinion that the product did not function as would be typically required.  See Goebel II, 346 F.3d at 992 (observing that an expert's conclusions can be excluded where "there is simply too great an analytical gap between the data and the opinion proffered").

In the same manner, IBM challenges Mr. Hilliard's "obvious functionality test." When Mr. Hilliard referred to "obvious functionality," he was setting forth an appropriate method for parties to an implementation to determine "whether a particular feature or function is within the scope of an implementation."  [Doc 188-1 at 16-17]  He stated that "there is only one sensible method to resolve this problem" of scope, and he opined that the solution "is to analyze the feature or function and determine whether it is *necessary* in order for the capability described in the Statement of Work to operate as normal and customary in the applicable industry."  [Id. at 17]  IBM contends that this is a subjective methodology, which "cannot be tested (by IBM or anyone else), which produces inadmissible results."

This argument seems to be related to IBM's position that Mr. Hilliard cannot opine on the functionality of the software without having conducted independent software tests. [Doc 176 at 10]  This position again assumes that Mr. Hilliard intends to testify about the software, and not the effectiveness of the implementation.  Mr. Hilliard is an expert on

process, and in his opinion and experience, it is necessary to develop a process for determining the scope of an implementation.  His opinion appears to be that apart from the contract specifications, some features are "obviously" required and that those "obvious" features are necessarily a part of the project scope.  There is no flaw in methodology here—Mr. Hilliard evaluated the contract, Summit's business needs, and documentation about what IBM produced.  IBM could easily conduct the same review.

Next, IBM contends that Mr. Hilliard's analysis is unreliable because it cannot be recreated—that he "made no record of what he reviewed, what people told him, whose work he relied on, or what he saw (or wrote) in instant messages. . . ."  [Doc 176 at 11-12]  Mr. Hilliard's report states that he spoke with specific people and reviewed specific deposition testimony.  Although Mr. Hilliard could not recall at his deposition which documents he viewed in the generically cited database, he heavily footnoted his report such that it is clear what he *relied* on to reach his opinions.  IBM could recreate Mr. Hilliard's process, as noted above, by reviewing the contracts, the documents, and the depositions that Mr. Hilliard examined.  To the extent that, when asked, Mr. Hilliard acknowledged other sources in his deposition, he specifically stated that he did not rely on those sources to reach his opinions.  Thus, IBM could test Mr. Hilliard's method by subjecting these materials to review by an implementation expert.

In addition to these broad challenges, IBM makes several arguments related to specific opinions.  First, IBM contends that Mr. Hilliard formulated an impermissibly speculative opinion.  In his report, Mr. Hilliard states the following:

> In retrospect, the implementation problems Summit experienced, along with the fact that there had only been one other Wholesale Express implementation at that time, raises major questions:
>
> Was the Wholesale Express product and service offering that Summit contract for actually a solid and proven offering, capable of delivering on the promises IBM had made for it as of March 2005?
>
> . . . .
>
> Or was it just an unproven marketing concept that IBM was trying to piece together, built around a group of SAP configuration templates (called "transports") it had implemented for other clients in marginally related or unrelated business sectors?
>
> As of the date of this report, I am advised that IBM and various third parties have yet to produce significant documentation related to this issue. As a result, there is still not enough information available to reach a definitive conclusion on this issue. However, the evidence I have reviewed to date suggests strongly that the claims IBM made to Summit about Wholesale Express in the several months leading up to th April 2005 implementation were, at best, highly questionable in a number of important respects.

[Doc 188-1 at 21-22]  Mr. Hilliard then continues his analysis to explain that "[i]f Wholesale Express had been a tested and proven offering in the spring of 2005 as it was portrayed to Summit, I would have expected it to have had a number of characteristics which the evidence does not support." [Id. at 22]  At that point, Mr. Hilliard lists a number of attributes that Wholesale Express should have had. [Id. at 22-24]  After that, Mr. Hilliard stated that "IBM has not yet produced all of the documentation requested by Summit in this litigation and it would be preferable to have access to this documentation before reaching a final conclusion regarding the status of the Wholesale Express pre-configured implementation offering." [Id. at 25]  Despite the lack of desired documents,

Mr. Hilliard states that he has two documents that "provide insight" into the question, and he discusses the details of these documents and explains how they support his opinion regarding the readiness of the Wholesale Express product.  [Id.]

Based on the full explanation from Mr. Hilliard's report, this conclusion is not inadmissible "subjective belief or unsupported speculation."  Daubert, 509 U.S. at 590 (internal quotation marks and citation omitted).  Mr. Hilliard, relying on his experience as a business software consultant, outlined what an expert in software selection would expect to see in candidate software and then, using IBM's documents, concluded that the Wholesale Express product did not meet those professional expectations.  There is no indication, in this regard, that Mr. Hilliard has not employed "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  Goebel II, 346 F.3d at 992 (internal quotation marks and citation omitted).

IBM also argues that Mr. Hilliard lacks the requisite "specialized knowledge" for his opinions to be admissible under Rule 702.  [Doc 176 at 13]  Specifically, IBM contends that Mr. Hilliard failed to rely on authoritative sources and that Mr. Hilliard has no training in project management.  [Id.]  During his deposition, Mr. Hilliard was asked whether he had "any particular training in SAP project management," and he answered "[n]o."  [Doc 176-3 at 12]  Nevertheless, Mr. Hilliard is a "Certified Management Consultant," and in order to be so certified, the individual must meet the following standards:

At least five years experience in the full-time practice of management

consulting, with major responsibility for client projects during at least one
of those years

. . . .

Multiple references, most of them officers or executives of client
organizations.  These references have been investigated to assure that the
consulting relationships were satisfactory

. . . .

Provided written summaries of five client assignments (disguised to protect
client identity)

. . . .

Passed a qualifying interview by senior CMCs, demonstrating professional
competence, currency in areas of specialization, application of experience,
and understanding of the management consulting process

[Doc 188-1 at 36]   In addition, Mr. Hilliard has assisted in excess of 200 companies in

the selection of "business computer systems."  [Id. at 1]  Thus, although Mr. Hilliard may

not have taken training in "SAP project management," his experience and credentials are

sufficient to allow him to testify about project management based on his "specialized

knowledge."  See Kumho Tire Co., 526 U.S. at 150 (observing that there are "many

different kinds of experts, and many different kinds of expertise" and further that in some

cases, "the relevant reliability concerns may focus upon personal knowledge or

experience").

        IBM next posits that Mr. Hilliard's specialized knowledge is insufficient because

he acknowledged that he did not "consult any of the materials that [he] would consider to

be authoritative on the subject of project management in doing any of [his] work in this

case. . . ."  [Id.]  Again, Mr. Hilliard has based his opinions on his accumulated

knowledge and experience, as well as his inquiry into the facts of the present case.  Any

divergence between his opinion and the authoritative materials to which IBM refers, goes

to the weight assigned to Mr. Hilliard's testimony and not its admissibility.  See Tingley

v. Radionics, 193 Fed.Appx. 747, 769 (10th Cir. 2006) (determining that a disagreement

between two experts "goes to the weight and not the admissibility" of an expert's

opinion).  It should be noted, however, that when an expert bases his opinion solely on his

own experience, "the witness must explain how that experience leads to the conclusion

reached, why that experience is a sufficient basis for the opinion, and how that experience

is reliably applied to the facts."  United States v. Nacchio, 555 F.3d 1234, 1258 (10th Cir.

2009) (internal quotation marks and citation omitted).  This Court's "gatekeeping

function requires more than simply taking the expert's word for it."  Id. (internal

quotation marks and citation omitted).  In the present case, the Court finds that 200

business software implementations are sufficient to provide a person with sufficient

knowledge to evaluate an implementation in order to form an opinion regarding the

process that was utilized.

IBM's final challenge to Mr. Hilliard's methodology relates to the "Gap List,"

which IBM describes as a list "of disputed software functionality items."  [Doc 176 at 13]

Mr. Hilliard explained that he requested a Summit employee, Mr. Farmer, to take the Gap

List and "categorize the Gaps among the nine categories,"  which are described in his

report.  [Doc 176-3 at 9; See Doc 188-1 at 18]  After Mr. Farmer, and others, categorized

the Gaps, Mr. Hilliard performed "spot-checking," in order to "determine whether the judgment that was exercised was a conservative judgment that I would be comfortable with, rather than something designed to build a case one way or another."  [Doc 176-3 at 9]  Mr. Hilliard testified that he looked at all of the categorizations but that he "looked in some detail at two or three dozen" out of 160 to 180  Gaps.  [Id.]  IBM contends that Mr. Hilliard's opinions regarding the Gap List are inadmissible because he "chose to rely upon hearsay-upon-hearsay (the un-named persons to Mr. Farmer to Mr. Hilliard) rather than performing the Gap list analysis himself."  [Doc 176 at 13]

It is first notable that Mr. Hilliard testified that he "looked at all of" the Gaps but that "most of these eight categories are clear-cut, externally verifiable" and that he did not focus on the Gaps that were "yes-or-no categories."  [Doc 176-3 at 9]  Thus, it appears that while Mr. Hilliard did not perform the analysis, he reviewed all of the work.  In addition, "Rule 703 provides that expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts or data are of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Daubert, 509 U.S. at 595 (internal quotation marks and citation omitted).  Mr. Hilliard states in his Declaration that "[i]n relying on Summit personnel to initially place gaps into the nine categories I used in my analysis, I acted in accordance with my own prior practices and the practices of most consultants I know of in our industry with respect to a task like that, whether performed in a litigation context or a more general consulting context."  [Doc 188 at 10]  The Court concludes that there is sufficient basis for Mr.

Hilliard's reliance on others to compile the data that formed the basis for his analysis.

## c.    Individual Opinions

"Generally, an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts." Christiansen v. City of Tulsa 332 F.3d 1270, 1283 (10th Cir. 2003) (internal quotation marks and citation omitted).  IBM contends that Mr. Hilliard has impermissibly opined on a disputed legal issue when he stated that "[o]ne thing the Blueprint is not intended to do is limit the scope or change the Statement of Work."  [Doc 176 at 14]  Summit responds that this statement is not a legal opinion, but rather "an opinion based on the 'custom and practice' in the industry, the express terms of the Statement of Work, and the deposition testimony of IBM's own witnesses."  [Doc 187 at 24]

While an expert may not testify to legal conclusions, "Fed. R. Evid. 704(a) allows an expert witness to testify in the form of an opinion or inference even if that opinion or inference embraces an ultimate issue to be determined by the trier of fact."  Phillips v. Calhoun, 956 F.2d at 952.  In the present case, the ultimate legal question is whether one of the parties breached the contract.  Mr. Hilliard's statement answers a hotly disputed question regarding which contract controlled the scope of the work.  His opinion is a legal conclusion drawn by application of the facts, and will not be permitted.  See Christiansen, 322 F.3d at 1283.

IBM additionally argues that on "at least two occasions," Mr. Hilliard "offers his opinion of what IBM employees were thinking."  [Doc 176 at 15]  The two opinions at

issue are as follows.  In his report, Mr. Hilliard quotes the text of an email sent from an

IBM employee and provides the following assessment of the communication:

(1)     The meaning of this email, interpreting its content as it would normally be
        understood by computer industry professionals, is a clear instruction to the
        IBM consultants that they should ignore IBM's prior commitment to
        implement the SAP R/3 software as specified in Statement to Work (despite
        the IBM acknowledgments cited above stating that it is the Statement of
        Work that governs the implementation scope and without concurrence of
        Summit) and stop adding new development to the project scope other than
        what was on the approved list as of that date.

[Doc 188-1 at 12-13]  In another section of the report, Mr. Hilliard makes the following

assessment:

(2)     [B]y the time Mr. Mantas assumed an active principal executive role on the
        project, in my observation, he was no longer doing so to bring the project to
        a successful conclusion within a reasonable time and at a fixed price (plus
        the cost of subsequent PCRs) that IBM and Summit had agreed in March
        2005, it was to either coerce Summit into paying more for the originally
        agreed result, or to put an end to IBM's losses by terminating the project.

[Id. at 28]  IBM contends that these opinions are irrelevant and that Mr. Hilliard is not

qualified to offer such insight.  [Id.]

        Summit acknowledges that the second opinion can be "construed as an

inappropriate comment on the purpose or intent of Mr. Mantas in taking certain actions"

and assures that "Mr. Hilliard will not offer his comment during trial testimony."  [Doc

187 at 23-24]  Accordingly, the Court need not address the propriety of that opinion.

        With regard to the first opinion, Summit maintains that Mr. Hilliard did not opine

on "state of mind," but rather used his "special knowledge of the computer software

industry to explain the meaning in that industry of words and phrases in an IBM email that would otherwise not make any sense to the jury."  [Id. at 24]

To support the exclusion of the opinion, IBM cites a case from the Southern District of New York, Highland Capital Mgmt., L.P. v. Schneider, 379 F.Supp.2d 461 (S.D.N.Y. 2005).  [Doc 176 at 15]  In that case, the plaintiffs sought to have a former United States Attorney testify, based on deposition testimony, pleadings, and documentary evidence, about the conduct at issue and how that conduct would be treated by a criminal prosecutor.  Id. at 465.  The court observed that "[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony" because such testimony "describes lay matters which a jury is capable of understanding and deciding without the expert's help."  Id. at 470-71 (internal quotation marks and citation omitted).  In the present case, Mr. Hilliard employed his experience as a computer industry professional to explain a technically-worded email, which the jury will not necessarily understand without assistance.  There is no indication that Mr. Hilliard is attempting to state what the particular recipients of the email believed or internalized, but rather what meaning an average computer professional would understand the language to impart.  See id. at 471-72 (observing that courts allow testimony from experts "merely to discuss the ordinary practices and usages of that industry").  Accordingly, the Court finds that Mr. Hilliard's analysis of the email is relevant to the breach of contract issue and does not impermissibly render an opinion about the reader's state of mind.

**3.**     **Admissibility**

Based on this review and analysis, Mr. Hilliard is sufficiently qualified to testify as an expert regarding his specialized knowledge of the selection and implementation process for business software.  The application of his experience and training to the specific documents and depositions in the present case is a methodology that a similar expert could reproduce.  His opinions regarding functionality and quality of the software are adequately based on his review of Summit's needs, the contract, and the documentation about the state of IBM's product.  Further, Summit has demonstrated that Mr. Hilliard reasonably relied on others to accumulate data in a fashion that is common in the industry.  Mr. Hilliard will not be permitted to opine on legal questions, and will not testify that the Blueprint documents were not intended to "limit the scope or change the Statement of Work."  His analysis of the internal IBM email, however, is admissible in order to explain the technical language and common understanding of such a directive. Accordingly, *Defendant International Business Machine Corporation's Renewed Motion To Exclude Report And Testimony Of Brooks L. Hilliard* [Doc 176] is granted in part and denied in part, all as set forth above.

**C.      Mr. Hiller—Proposed Damages Expert**

By separate *Motion*, IBM opposes the expert testimony of Summit's damages expert, Mr. Russel Hiller.  [See Doc 210 *Defendant International Business Machine Corporation's Motion To Exclude Damage Models And Testimony Of Russel D. Hiller*] Specifically, IBM contends that Mr. Hiller's testimony should be excluded because it is not relevant, he is not qualified to render certain opinions, his methodology is flawed and

unreliable, and because his testimony will be more prejudicial than probative, contrary to Rule 403.  The Court first considers the <u>Daubert</u> challenges and then turns to Rule 403.

**1.     Daubert Challenges**

Expert testimony is not admitted at trial unless it is both relevant and reliable.  <u>See</u> <u>Kumho Tire Co.</u>, 526 U.S. at 141.  IBM challenges both the relevance and the reliability of Mr. Hiller's testimony.  It is well established that under Rule 702, evidence must "assist the trier of fact."  The Supreme Court of the United States has explained that "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful" to the jury.  <u>Daubert</u>, 509 U.S. at 591 (internal quotation marks and citation omitted).  In order to determine whether evidence is "helpful," the proponent must establish a "valid scientific connection to the pertinent inquiry."  <u>Id.</u> at 591-92.   The question, according to the <u>Daubert</u> Court, is "one of fit."  <u>Id.</u> at 591 (internal quotation marks and citation omitted).  Fitness, the Court observes, is "not always obvious" because "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes."  <u>Id.</u>

The core of IBM's argument is that Mr. Hiller's cost-to-complete analysis does not take into account differences between the product and services contemplated by the agreement between the parties and the ultimate SAP implementation that was performed by Summit.  [Doc 210 at 8]  As a result, IBM contends that "Mr. Hiller's opinions do not estimate the cost of the original contract design, do not 'fit' the facts of the case, are irrelevant, and should be excluded."  [<u>Id.</u>]  Summit responds that the question of whether

the final product that Summit produced and the final product that IBM promised were

materially different is a question for the jury to answer.

Summit does not deny that Mr. Hiller did not "employ any methods or any

analysis in connection with any of [his] damage calculations in order to ensure that those

were damages caused by the alleged breach and not caused by any other potential event

or influence. . . ."  [Doc 219-1 at 10]  Essentially, Mr. Hiller seems to have determined

that the implementation cost an amount of money to complete, the original contract was

for a smaller amount, and that the damages are the difference, minus Summit's internal

costs that would have existed regardless.  [See Doc 213, Third Declaration of Russel

Hiller at 2-3 ("My methodology was to subtract from the total cost of the entire project,

both during and after IBM's involvement, those costs that would have been incurred by

Summit even if IBM had completed the project in the prescribed 23 weeks, such as

contractual payments to IBM, Summit's internal labor costs during that 23 weeks, and the

cost of hardware, software, and related items that were never part of the IBM contract to

begin with.").  Mr. Hiller does not appear to have taken into account any features that

were implemented that were arguably not contemplated by the contract with IBM, any

unreasonable delays or expenses in Summit's implementation, or any changes in market

conditions or costs.  [Id. at 9-10]  During his most recent deposition, Mr. Hiller was asked

"What is the underlying assumption?  Is the assumption that the damages would not have

occurred if IBM had completed the project?"  [Id. at 9]  Mr. Hiller responded, "Yes."

[Id.]  Mr. Hiller's ultimate answer may be reasonable, but Mr. Hiller failed to include so

much information in his expert analysis that the final opinion will not be helpful to the

jury.  See Sunlight Saunas, Inc. v. Sundance Sauna, Inc., 427 F.Supp.2d 1022, 1031

(D.Kan. 2006) ("Because [the expert] attributes all lost profits to defendants without

considering increased competition in the market, other market conditions or alleged

wrongdoing of other competitors, [the expert's] testimony would not assist the jury in

determining the fact or the amount of damages.").  As a result, his expert analysis is not

relevant and cannot be admitted.

        As the record stands, Mr. Hiller's analysis does not provide suitable expert

opinion.  Despite this conclusion, however, a  great deal of information is within Mr.

Hiller's personal knowledge, as Summit's Chief Financial Officer (CFO).  IBM states that

"Mr. Hiller cannot testify regarding damages as a lay witness under Rule 701," but fails

to provide any authority for the proposition. The Court concludes that Mr. Hiller can

testify to information that is within his personal knowledge as the CFO, but he will not be

permitted to testify regarding calculations that he has conducted and conclusions that he

has drawn in preparation for his anticipated expert testimony. An limiting instruction can

be offered to the prevent the jury from assuming that Mr. Hiller's testimony is expert

testimony.  See James River Ins. Co. v. Rapid Funding, LLC, No. 07-cv-1146, 2010 WL

965523, *2 (D.Colo. March 16, 2010) ("[T]he jury was expressly instructed that Mr.

Miller was testifying as a lay witness, by virtue of his position as an officer of the

company that owned the damaged building, and not as an expert witness.").  **3. Rule 403**

        IBM also argues that Mr. Hiller's evidence should be excluded on the basis of

Federal Rule of Evidence 403 which provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  IBM contends that Mr. Hiller's complex calculations, which are purportedly based on Summit's business accounting records and financial statements, together with his status as the CFO, will be unduly prejudicial.  Further, IBM argues that Mr. Hiller's expert testimony is of little probative value due to the deficiencies in methodology.

Because Mr. Hiller will not be permitted to testify as an expert and because he will not be permitted to present his complex calculations, the prejudice that could result from Mr. Hiller's testimony is substantially reduced.  By the same token, Mr. Hiller's testimony as to his personal knowledge as the CFO becomes more probative because no other information will be available from which the jury could evaluate Summit's alleged damages.  Accordingly, having balanced the interests, the Court finds that Mr. Hiller's lay testimony is more probative than prejudicial and is therefore admissible under Rule 403.  Accordingly, *Defendant International Business Machine Corporation's Motion To Exclude Damages Models And Testimony Of Russel D. Hiller* [270] is granted in part and denied in part, all as set forth above.

## III.    CONCLUSION

For the foregoing reasons, Mr. Hilliard and Mr. Hiller will be permitted to testify, within the parameters  established by this Opinion.

**IT IS THEREFORE ORDERED** that *Defendant International Business Machine Corporation's Renewed Motion To Exclude Report And Testimony Of Brooks L. Hilliard* [Doc 176] is granted in part and denied in part and that *Defendant International Business Machine Corporation's Motion To Exclude Damages Models And Testimony Of Russel D. Hiller* is granted in part and denied in part.[Doc 210]

**SO ORDERED** this 30th day of September 2010, in Albuquerque, New Mexico.

M. CHRISTINA ARMIJO
United States District Judge